[No. H028147. Sixth Dist. May 26, 2006.]

SAN LORENZO VALLEY COMMUNITY ADVOCATES FOR
RESPONSIBLE EDUCATION, Plaintiff and Appellant, v.
SAN LORENZO VALLEY UNIFIED SCHOOL DISTRICT, Defendant and
Respondent.

COUNSEL

Dawson, Passafuime, Bowden & Martinez, Gerald Bowden and Kathleen Morgan-Martinez for Plaintiff and Appellant.

Burton, Volkmann & Schmal, Timothy R. Volkmann and John P. Loringer for Defendant and Respondent.

OPINION

McADAMS, J.—This action arises out of a decision by the defendant school district to close two elementary schools in the San Lorenzo Valley area of Santa Cruz County. Plaintiff seeks to overturn the closure decision, alleging that it violates various state laws, including the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.), the California Public Records Act (Gov. Code, § 6250 et seq.), the Ralph M. Brown Act (Gov. Code, § 54950), provisions of the Education Code, and school bond financing laws. The trial court rejected all of the plaintiff's contentions. We shall affirm.

## BACKGROUND

This suit was brought by plaintiff and appellant San Lorenzo Valley Community Advocates for Responsible Education, an unincorporated association (SLV CARE). SLV CARE challenges a school closure decision made by defendant and respondent San Lorenzo Valley Unified School District (the District). At issue is the District's April 2003 decision to close two of its elementary schools and to transfer students from those schools to the District's other two elementary school campuses. Plaintiff SLV CARE challenges that decision on various legal grounds.

### Factual Summary

The District made the challenged decision in response to declining enrollment and fiscal difficulties. The initial decision to close one or more schools was approved by District's Board of Trustees (Board) in December 2002. From December 2002 to June 2003, the district entertained public comment on the issue at its regular and special board meetings.

*January 2003–March 2003: First Advisory Committee*

The District also convened a task force—called the Superintendent's School Closure Committee (SSCC)—to consider the school closure question

and make a recommendation to the Board. The SSCC was composed of 17 people representing all of the affected schools; task force members included seven parents, four teachers, four classified employees, and two community members.

Between mid-January and mid-March 2003, the SSCC met formally eight times; ad hoc subcommittees also met separately. In mid-March 2003, after considering an extensive body of information about the schools, the SSCC recommended the closure of Redwood and Quail Hollow Elementary Schools. To consolidate student populations at the north end of the San Lorenzo Valley, in Boulder Creek, Redwood students would be transferred to Boulder Creek Elementary School (BCE). At the south end of the valley, in Felton, Quail Hollow students would be transferred to San Lorenzo Elementary School (SLE).

### April 2003: Closure Decision

At a public meeting held on April 8, 2003, the District's Board considered and ultimately adopted the recommendation of the SSCC. Thus, as to the north valley elementary schools, the Board voted to close Redwood, and keep BCE open. As for the south valley, the Board voted to close Quail Hollow and keep SLE open.

In May 2003, a community group proposed private fundraising to keep Redwood Elementary School open for the upcoming school year. The Board rejected that proposal the following month.

### June 2003–October 2003: Requests for Public Records

Starting in June 2003, various written requests for public records relating to the closure decision were made by attorney Steven A. Greenburg, acting as counsel for plaintiff SLV CARE.

In July 2003, the District forwarded more than 400 pages of records to Greenburg. The following month, acting through its counsel, the District provided Greenburg with additional documents. After October 2003, document requests were addressed through formal discovery.

An additional request for documents was e-mailed to the District by San Lorenzo Valley resident David Churchill, with a copy to attorney Greenburg. The principal subject of Churchill's request was the District's use of money from Measure S, a multimillion-dollar school facilities bond issue that had been approved by local voters in 2000.

*June 2003–October 2003: Consideration of Environmental Impacts*

In early August 2003, in response to public concerns—and notwithstanding its receipt of earlier legal advice that the school closure decision was exempt under the California Environmental Quality Act (CEQA)—the District retained consultants to evaluate possible environmental impacts, including traffic. The District retained environmental consultant Stephen Graves & Associates (Graves). The District also hired traffic consultant Keith Higgins & Associates (Higgins).

Graves, the environmental consultant, confirmed that the school consolidation decision was exempt from CEQA. On August 19, 2003, the District formally approved the filing of a notice of exemption from CEQA. Despite the exemption, the District authorized Graves to prepare an initial study of environmental effects. The initial study concluded that the school closures and transfers would not create any significant environmental impacts, and that potential traffic impacts, though insignificant, could be minimized with recommended project conditions. After public comment and response, Graves stood by the conclusions in the initial study.

As for traffic, by June 2003, the Public Works Department of Santa Cruz County had advised the Board of Supervisors of the need for an ordinance to reroute traffic in the San Lorenzo Valley following the school closure decision. The initial study by environmental consultant Graves incorporated a report by traffic consultant Higgins. That report identified anticipated traffic and parking problems resulting from the school consolidations. Nevertheless, the traffic report concluded, mitigation measures were not mandatory because those impacts would not exceed historic levels. With respect to BCE, however, the report noted that the District was "planning on implementing several strategies to improve traffic and parking operations" as described in the report. The District implemented those strategies.

By October 2003, having considered the issues, the District was prepared to approve the adoption of a negative declaration, thus confirming the absence of significant environmental impacts. No environmental impact report was prepared.

*Fall 2003: Second Advisory Committee*

In August 2003, the District's Board voted to convene a Surplus Property Advisory Committee (SPAC). At the same time, it approved an application form for membership on the committee. In October 2003, the District's Board approved the proposed roster of SPAC members. The Board meeting minutes of November 4, 2003, state: "The Board has declared the District Office and

Redwood Elementary School surplus property as a result of the Board decision to close Redwood Elementary and Quail Hollow Elementary Schools and move the District Office from the Felton site to Quail Hollow." Those minutes further state that the purpose of the public hearing on the SPAC was "to provide input to the committee for the purpose of determining acceptable uses of these properties." The SPAC met three times, from late October to mid-November 2003. In December 2003, the SPAC presented its recommendations for Redwood Elementary and the District Office, which included commercial, community, and educational uses.

## Procedural History

Plaintiff SLV CARE brought this action, challenging the District's closure decision. As amended in August 2004, the complaint states five causes of action, all asserting statutory violations by the District. The first cause of action is for breach of statutory duties arising out of school bond financing laws. The second cause of action alleges CEQA violations. The third cause of action asserts breach of Education Code mandates for community input on certain decisions. The final two causes of action allege violation of the California Public Records Act, which requires disclosure of public records, and of the Ralph M. Brown Act, which compels open public meetings.

The court conducted a six-day bench trial, which started on August 30, 2004, and concluded on September 8, 2004. At the close of evidence and argument, the court took the matter under submission. It issued a statement of decision on September 13, 2004, finding for the District on all claims.

In November 2004, the court entered judgment for the District. This appeal by SLV CARE followed.

## CONTENTIONS

On appeal, SLV CARE renews its trial court claims that the District violated CEQA, bond financing laws, the California Public Records Act, the Ralph M. Brown Act, and the Education Code. In addition, SLV CARE asserts that the trial court made certain erroneous evidentiary rulings and that it demonstrated bias. Appellant SLV CARE also seeks an award of attorney fees and costs. The District opposes all of appellant's arguments.

## DISCUSSION

We consider each issue in turn, beginning with the claims of statutory violation.

## I. CEQA

SLV CARE asserts that the District violated CEQA. To establish the proper framework for assessing that contention, we begin by summarizing the governing legal principles.

### A. General Principles

CEQA is codified at division 13 of the Public Resources Code, beginning with section 21000.[1] As an aid to carrying out the statute, the state Resources Agency has issued a set of regulations, called Guidelines for the California Environmental Quality Act (Guidelines).[2]

 CEQA embodies our state's policy that "the long-term protection of the environment . . . shall be the guiding criterion in public decisions." (§ 21001, subd. (d); see *Davidon Homes v. City of San Jose* (1997) 54 Cal.App.4th 106, 112 [62 Cal.Rptr.2d 612].) As this court has observed, "the overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117 [104 Cal.Rptr.2d 326].) Together, the statute and accompanying regulatory guidelines protect a variety of environmental values. Human health is among them. (See Guidelines, § 15065, subd. (a)(4).)

#### 1. *The Three-step CEQA Process*

 Consistent with California's strong environmental policy, whenever the approval of a project is at issue, the statute and regulations "have established a three-tiered process to ensure that public agencies inform their decisions with environmental considerations." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 112; see also *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1371 [43 Cal.Rptr.2d 170].)

##### a. *Threshold Determination of CEQA's Applicability*

 "The first tier is jurisdictional, requiring that an agency conduct a preliminary review in order to determine whether CEQA applies to a proposed activity. (Guidelines, §§ 15060, 15061.)" (*Davidon Homes v. City of*

---

[1] In this section of the opinion (pt. I), which discusses CEQA, further unspecified statutory references are to the Public Resources Code.

[2] The Guidelines are contained in the California Code of Regulations, title 14, division 6, chapter 3, starting at section 15000. Further unspecified guideline references are to those regulations.

*San Jose, supra,* 54 Cal.App.4th at p. 112.) CEQA applies if the activity is a "project" under the statutory definition, unless the project is exempt. (See §§ 21065, 21080.) "If the agency finds the project is exempt from CEQA under any of the stated exemptions, no further environmental review is necessary." (*Davidon Homes,* p. 113.) In such cases, the agency may file a notice of CEQA exemption, if it chooses to do so. (Guidelines, § 15062, subd. (a); see *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1171 [109 Cal.Rptr.2d 504].)

If the project is not exempt—either because it does not fall within an exempt category or because an exception makes the exemption unavailable—then the agency must proceed to the second tier and conduct an initial study. (*Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 792 [124 Cal.Rptr.2d 731]; see Guidelines, § 15063.)

 b. *Initial Study*

■ The second tier of the process, the initial study, serves several purposes. One purpose is to inform the choice between a negative declaration and an environmental impact report (EIR). (Guidelines, § 15063, subd. (c)(1); *Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180 [31 Cal.Rptr.3d 901].) Another of the initial study's purposes is to eliminate unnecessary environmental impact reports. (Guidelines, § 15063, subd. (c)(7).)

■ "CEQA excuses the preparation of an EIR and allows the use of a negative declaration when an initial study shows that there is no substantial evidence that the project may have a significant effect on the environment." (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389–390 [83 Cal.Rptr.2d 836], citing Guidelines, § 15070; see also Pub. Resources Code, §§ 21064, 21080, subd. (c).) In certain situations where a straightforward negative declaration is not appropriate, the agency may permit the use of a mitigated negative declaration. (See § 21064.5; Guidelines, § 15064, subd. (f)(2); *San Bernardino Valley Audubon Society,* at p. 390.)

 c. *Environmental Impact Report*

■ If the project does not qualify for a negative declaration, "the third step in the process is to prepare a full environmental impact report . . . ." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 113, citing §§ 21100 and 21151, and Guidelines, §§ 15063, subd. (b)(1) & 15080; *Gentry v. City of Murrieta, supra,* 36 Cal.App.4th at p. 1372.)

■ The California Supreme Court has "repeatedly recognized that the EIR is the 'heart of CEQA.' " (*Laurel Heights Improvement Assn. v. Regents*

*of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).) As the court observed more than three decades ago, "since the preparation of an EIR is the key to environmental protection under CEQA, accomplishment of the high objectives of that act requires the preparation of an EIR whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66], criticized on another point in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 576 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) Other cases have since confirmed the statutory preference for resolving doubts in favor of an EIR. (See, e.g., *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 703 [7 Cal.Rptr.3d 868]; *League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 905 [60 Cal.Rptr.2d 821].)

### 2. *Timing*

██ "Choosing the precise time for CEQA compliance involves a balancing of competing factors. EIRs and negative declarations should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment." (Guidelines, § 15004, subd. (b); see also, e.g., *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 395 [253 Cal.Rptr. 426, 794 P.2d 278].) As a general rule, "public agencies shall not undertake actions concerning the proposed public project that would have a significant adverse effect or limit the choice of alternatives or mitigation measures, before completion of CEQA compliance." (Guidelines, § 15004, subd. (b)(2).)

When a project is exempt, however, a somewhat different timing rule applies. "When a public agency decides that a project is exempt from CEQA . . . , the agency may file a notice of exemption. The notice shall be filed, if at all, *after* approval of the project." (Guidelines, § 15062, subd. (a), italics added.) "A notice of exemption may be filled out and may accompany the project application through the approval process" but it "shall not be filed . . . until the project has been approved." (*Id.*, subd. (b); see also Guidelines, § 15061, subd. (d).)

### 3. *Judicial Review*

At issue here are CEQA challenges to a quasi-legislative action taken by the District, in a procedural setting where no administrative hearing was required. (See *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 74,

fn. 3; *City of South Gate v. Los Angeles Unified School Dist.* (1986) 184 Cal.App.3d 1416, 1423–1424 [229 Cal.Rptr. 568] *(South Gate); Dehne v. County of Santa Clara* (1981) 115 Cal.App.3d 827, 835–836 [171 Cal.Rptr. 753].) Judicial review of such challenges is governed by well-established rules.

### a. *Prejudicial Abuse of Discretion*

Where a party seeks judicial review of a quasi-legislative decision "on the grounds of noncompliance with [CEQA], the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5; see also, e.g., *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 88; *Lighthouse Field Beach Rescue v. City of Santa Cruz, supra,* 131 Cal.App.4th at p. 1182.) Generally speaking, an agency's failure to comply with the procedural requirements of CEQA is prejudicial when the violation thwarts the act's goals by precluding informed decisionmaking and public participation. (See, e.g., *Lighthouse Field Beach Rescue,* at pp. 1182, 1202 [deficient initial study]; *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1198 [22 Cal.Rptr.3d 203] [deficient EIR].)

"The determinations that an agency makes during a preliminary review are subject to judicial review under the abuse of discretion standard contained in section 21168.5." *(Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 636 [10 Cal.Rptr.3d 560]; *City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810, 821 [17 Cal.Rptr.2d 766], disapproved on another point in *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 576, fn. 6.)

### b. *Independent Review*

The foregoing review standard applies to case-specific issues of compliance with the law and sufficiency of the evidence. But "questions of interpretation or application of the requirements of CEQA are matters of law." *(Save Our Peninsula Committee v. Monterey County Bd. of Supervisors, supra,* 87 Cal.App.4th at p. 118; accord, *Bakersfield Citizens for Local Control v. City of Bakersfield, supra,* 124 Cal.App.4th at p. 1207.) Thus, for example, interpreting the scope of a CEQA exemption presents "a question of law, subject to de novo review by this court." *(Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251 [89 Cal.Rptr.2d 233]; accord, *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 792; see also, e.g., *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1192 [61 Cal.Rptr.2d 447].)

## B. Application

Addressing the first tier of the analysis, we consider whether CEQA applies to the school consolidation decision at issue here. That inquiry involves two threshold questions: Is this a project under CEQA? If so, is it exempt?

### 1. *The District's School Closure Decision Is a Project Under CEQA.*

██ At the threshold, for CEQA to apply, the activity or decision at issue must constitute a "project" under the statute. CEQA applies only to "discretionary *projects* proposed to be carried out or approved by public agencies . . . ." (§ 21080, subd. (a), italics added.) "If there was no 'project,' there was no occasion to prepare either a negative declaration or an EIR." (*Simi Valley Recreation & Park Dist. v. Local Agency Formation Com.* (1975) 51 Cal.App.3d 648, 663 [124 Cal.Rptr. 635]; accord, *Prentiss v. Board of Education* (1980) 111 Cal.App.3d 847, 852 [169 Cal.Rptr. 5] (*Prentiss*), questioned on another point in *Fullerton Joint Union High School Dist. v. State Bd. of Education* (1982) 32 Cal.3d 779, 796, fn. 16 [187 Cal.Rptr. 398, 654 P.2d 168] (*Fullerton*).)

### a. *Definition*

██ "A 'project' is an activity subject to CEQA." (Guidelines, § 15002, subd. (d).) As relevant here, "project" means activity by a public agency that "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Pub. Resources Code, § 21065, subd. (a).)[3] "The word 'may' in this context connotes a reasonable possibility." (*Citizen Action to Serve All Students v. Thornley* (1990) 222 Cal.App.3d 748, 753 [272 Cal.Rptr. 83].) " 'Environment' means the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, objects of historic or aesthetic significance." (§ 21060.5.)

---

[3] Section 21065 provides in full as follows: " 'Project' means an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

The statutory definition of a CEQA project "is amplified in the Guidelines," which clarify that a project means " '*the whole of an action*, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment. . . .' (Guidelines, § 15378, subd. (a), italics added.)" (*Association for a Cleaner Environment v. Yosemite Community College Dist., supra*, 116 Cal.App.4th at p. 637; see also, e.g., *Lighthouse Field Beach Rescue v. City of Santa Cruz, supra,* 131 Cal.App.4th at p. 1180.)

To maximize environmental protection, the concept of a "project" is broadly defined under CEQA. (*Lighthouse Field Beach Rescue v. City of Santa Cruz, supra,* 131 Cal.App.4th at p. 1180.)

b. *Judicial Determination*

"Exactly what constitutes a project within the meaning of CEQA is a question which has been addressed by California courts on several occasions since the enactment of CEQA in 1970." (*Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 472 [11 Cal.Rptr.2d 792].)

As articulated in recent case authority, there is a two-pronged test for determining whether a public agency's action qualifies as a project under CEQA: The first consideration is "whether there has been an 'activity directly undertaken by any public agency.' (§ 21065, subd. (a).)" (*Association for a Cleaner Environment v. Yosemite Community College Dist., supra,* 116 Cal.App.4th at p. 639.) "The second test for a 'project' is whether the activities have a 'potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . .' (Guidelines, § 15378, subd. (a).)" (*Ibid.*)

Where the facts in the record are undisputed, the court decides as a matter of law whether the challenged activity falls within CEQA's definition of a project. (*Fullerton, supra,* 32 Cal.3d at pp. 794–795; *Association for a Cleaner Environment v. Yosemite Community College Dist., supra,* 116 Cal.App.4th at p. 637.)

c. *School Closures and Student Transfers*

Several published appellate cases have addressed the issue of CEQA's applicability to decisions involving school closures, the transfer of students between schools, or both.

In *Prentiss*, a case decided in 1980, the court held that a school closure decision was not a project under CEQA. (*Prentiss, supra,* 111 Cal.App.3d at

p. 851.) The *Prentiss* court reasoned that the school district's decision to close an elementary school was not "a necessary step in the development of property for a new and different use" and thus was not subject to CEQA. (*Prentiss,* at p. 853.) But the California Supreme Court has since questioned that holding in a plurality opinion. (See *Fullerton, supra,* 32 Cal.3d at p. 796, fn. 16; but see *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198] [criticizing *Fullerton* on another point, and further noting that as a plurality opinion, it "lacks authority as precedent"].) As the plurality said in *Fullerton*: "The decision in *Prentiss* . . . , that the closure of a school is not a 'project' because the school board had not decided whether to put the land to a different use, is questionable. It may be unlikely that the closure of a single elementary school would have a significant environmental impact apart from its effect on the use of the property—the school board in *Prentiss* filed a negative declaration— but the possibility cannot be rejected categorically." (*Fullerton, supra,* 32 Cal.3d at p. 796, fn. 16.)

In a 1986 case, *South Gate,* the challenged action was the transfer of students from one campus to another, though without a school closure. (*South Gate, supra,* 184 Cal.App.3d at pp. 1423–1424.) At issue in *South Gate* was the school district's use of a pupil attendance boundary adjustment, a mechanism used to "distribute student population over the District so as to relieve school overcrowding." (*Id.* at p. 1420.) In concluding that CEQA did not apply to the transfer, the *South Gate* court conflated the two threshold concepts—project and exemption. As the court put it: "The District's action creating the boundary adjustment is not a project requiring an EIR because it is exempt under CEQA guidelines . . . ." (*Id.* at p. 1423.)

A 1989 case, *East Peninsula,* involved the decision to close a high school and transfer its students to other campuses. (*East Peninsula Ed. Council, Inc. v. Palos Verdes Peninsula Unified School Dist.* (1989) 210 Cal.App.3d 155 [258 Cal.Rptr. 147] (*East Peninsula*).) Again, both threshold issues were at issue: "whether the [school] closure . . . and transfer of students is a project subject to CEQA" and "whether such action is statutorily exempt . . . ." (*Id.* at p. 165, fn. 5.) And again, the court conflated the two questions. In the court's view, the two issues involved "the same analysis" under the statutory language. (*Ibid.*) Furthermore, the court said: "In this case, for all practical purposes, the two concepts merge." (*Ibid.*) The court concluded that CEQA applied, that the school board used an "incorrect legal standard" in making the exemption determination, and that its failure to comply with CEQA was prejudicial. (*East Peninsula,* at p. 174; cf. *Citizen Action to Serve All Students v. Thornley, supra,* 222 Cal.App.3d at p. 752 [school district did not "consider the closure exempt from CEQA" but instead proceeded with a negative declaration]; *Fullerton, supra,* 32 Cal.3d at pp. 797, 798 [school district's reconfiguration and secession plan was a project under CEQA; it "is an essential step leading

to ultimate environmental impact" as it "necessarily entails building a new high school and other actions which may have an environmental effect"].)

### d. *Analysis*

Although some courts have conflated the issues presented in the first tier of the CEQA analysis, we shall separately address the first question first: Is this a project?

To answer that question, we turn to the two-pronged test for defining a project under CEQA, described above. (See *Association for a Cleaner Environment v. Yosemite Community College Dist., supra,* 116 Cal.App.4th at p. 639.) As to the first prong, there is no dispute that the decision challenged in this case is an "activity directly undertaken by any public agency." (§ 21065, subd. (a).)

Our focus is on the second prong—"whether the activities have a 'potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . .' (Guidelines, § 15378, subd. (a).)" (*Association for a Cleaner Environment v. Yosemite Community College Dist., supra,* 116 Cal.App.4th at p. 639.) As noted above, "project" is defined broadly for these purposes. (*Lighthouse Field Beach Rescue v. City of Santa Cruz, supra,* 131 Cal.App.4th at p. 1180.) But "the broad definition of project is tempered by the requirement that CEQA applies only to those activities which 'may have a significant effect on the environment.'" (*Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist., supra,* 9 Cal.App.4th at p. 471.) Applying those principles to the case at hand, we conclude that the District's school closure decision constitutes a project for CEQA purposes.

The consequences of the decision challenged here can be broken down into two components: (1) the closure of two schools (Redwood and Quail Hollow); and (2) the transfer of students from those schools to the District's two other campuses (BCE and SLE).

Concerning the first component, as a plurality of our state's high court recognized in *Fullerton,* while it "may be unlikely that the closure of a single elementary school would have a significant environmental impact apart from its effect on the use of the property . . . the possibility cannot be rejected categorically." (*Fullerton, supra,* 32 Cal.3d at p. 796, fn. 16.) As the *Fullerton* opinion stated: "Implementation of the secession Plan in the present case involves the possibility of a significant impact. Secession will likely require the construction of a new high school in Yorba Linda and may result in abandonment of some facilities in the remaining portion of the Fullerton HSD." (*Id.* at p. 794, fn. omitted.)

As for the second component, transferring students may "change bus routes and schedules, and affect traffic patterns." (*Fullerton, supra,* 32 Cal.3d at p. 794.) The transfer could increase traffic congestion and parking problems, with attendant environmental effects. (See, e.g., *Citizen Action to Serve All Students v. Thornley, supra,* 222 Cal.App.3d at pp. 755, 756.) The transfer component also may pose some possibility of "increased physical harm to relocated . . . students because of (1) the likelihood of a major earthquake . . . and (2) altercations with students at schools receiving transferred . . . pupils." (*Id.* at p. 757 [stating party's contention].) Under the circumstances, at least at the threshold, the "possibility that the activity in question may have a significant effect on the environment" cannot be positively ruled out. (Cf. Guidelines § 15061, subd. (b)(3); *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist., supra,* 9 Cal.App.4th at p. 471.)

In sum, both tests for defining a CEQA project are satisfied. We thus conclude that the school consolidation decision falls within the broad definition of a CEQA project. That conclusion finds further support in the very existence of a categorical exemption for school closures. As a matter of logic alone, if such closures were not CEQA projects, there would be no need for an exemption.

### 2. *The Project Is Exempt.*

Our conclusion that the challenged decision is a project brings us to the second part of the preliminary review analysis: Is the project exempt from CEQA? (See Pub. Resources Code, § 21080, subd. (a) [CEQA "shall apply to discretionary projects . . . unless the project is exempt"]; Guidelines, § 15061, subd. (a) [once the "agency has determined that an activity is a project subject to CEQA," it "shall determine whether the project is exempt from CEQA"]; *Association for a Cleaner Environment v. Yosemite Community College Dist., supra,* 116 Cal.App.4th at p. 640 [exemption is the "second issue arising in connection with the preliminary review"].)

### a. *CEQA Exemptions: General Principles*

 CEQA does not apply to projects that are statutorily or categorically exempt. (Guidelines, § 15061, subd. (b).) The Legislature has specified a number of statutory CEQA exemptions. (See, e.g., § 21080, subd. (b)(1)–(15); § 21080.18; § 21084; see *Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230–1231 [32 Cal.Rptr.2d 19, 876 P.2d 505].) The Legislature also has authorized the State Resources Agency to identify other categories of exemptions, which are contained in the Guidelines. (See *Sierra Club,* at pp. 1230–1231.) As to these, CEQA does not apply where there is "a

categorical exemption [in the Guidelines] and the application of that categorical exemption is not barred by one of the exceptions set forth in [Guidelines] Section 15300.2." (Guidelines, § 15061, subd. (b)(2).)

The Guidelines contain 33 classes of categorical exemptions. (Guidelines, §§ 15301–15333.) Each class embodies a "finding by the Resources Agency that the project will not have a significant environmental impact." (*Davidon Homes v. City of San Jose, supra,* 54 Cal.App.4th at p. 116; see also *Magan v. County of Kings* (2002) 105 Cal.App.4th 468, 475 [129 Cal.Rptr.2d 344]; Pub. Resources Code, § 21084, subd. (a).) In addition to the categorical exemptions, the Guidelines also incorporate a " 'common sense exemption,' " which " 'provides a short way for agencies to deal with discretionary activities which could arguably be subject to the CEQA process but which common sense provides should not be subject to the Act.' " (*Davidon Homes,* at pp. 112–113, citing Guidelines, § 15061, subd. (b)(3), and quoting the accompanying discussion.)

There are exceptions to the categorical exemptions. (See Guidelines, § 15300.2.) Among other things, a "categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (*Id.,* subd. (c); see *East Peninsula, supra,* 210 Cal.App.3d at p. 164.) This is sometimes called either the "significant effects" exception or the "unusual circumstances" exception. (See *City of Pasadena v. State of California, supra,* 14 Cal.App.4th at p. 824; *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 795.) "The Guidelines do not define the term 'unusual circumstances.' " (*City of Pasadena v. State of California, supra,* 14 Cal.App.4th at p. 826.) As explicated in case law, an unusual circumstance refers to "some feature of the project that distinguishes it" from others in the exempt class. (*Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1260.) In other words, "whether a circumstance is '*unusual*' is judged relative to the *typical* circumstances related to an otherwise typically exempt project." (*Santa Monica Chamber of Commerce,* at p. 801.)

b. *Judicial Determination*

As noted above, the court reviews decisions made during an agency's preliminary review for a prejudicial abuse of discretion. (*Association for a Cleaner Environment v. Yosemite Community College Dist., supra,* 116 Cal.App.4th at p. 636 [reviewing determination that there was no project].) When faced with a challenge to an agency's exemption determination, the court considers whether the agency proceeded in the manner required by law and whether its determination is supported by substantial evidence. (§ 21168.5; see, e.g., *East Peninsula, supra,* 210 Cal.App.3d at p. 165 [holding that school district failed to proceed in manner required by law];

*Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at p. 837 [holding that "planning commission's grant of a categorical exemption" for reconstruction of existing structures was "supported by substantial evidence"].) The scope of an exemption may be analyzed as a question of statutory interpretation and thus subject to independent review. (See, e.g., *Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at pp. 1258–1259 [interpreting the scope of a categorical exemption]; cf. *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 795 [same]; *Centinela Hospital Assn. v. City of Inglewood* (1990) 225 Cal.App.3d 1586, 1600 [275 Cal.Rptr. 901] [finding that the proposed facility was exempt as a matter of law].) But "the substantial evidence test governs our review of the [agency's] factual determination that a project falls within a categorical exemption." (*Fairbank,* at p. 1251.)

Because the exemptions operate as exceptions to CEQA, they are narrowly construed. (See, e.g., *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 793.) "Exemption categories are not to be expanded beyond the reasonable scope of their statutory language." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 125 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

c. *School Closure Exemption*

 At issue here is the categorical exemption applicable to public school closures. Pursuant to section 21080.18, CEQA "does not apply to the closing of any public school in which kindergarten or any of grades 1 through 12 is maintained or the transfer of students from that public school to another school if the only physical changes involved are categorically exempt under Chapter 3 (commencing with Section 15000)" of the Guidelines. Of the 33 classes of categorical exemptions set forth in the Guidelines, one applies to the situation presented here: "Class 14 consists of minor additions to existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, whichever is less. The addition of portable classrooms is included in this exemption." (Guidelines, § 15314.)

So far as we are aware, this particular exemption has been the subject of only one prior judicial decision, *East Peninsula.*[4] In that case, the defendant school board approved a high school closure and transfer of students. (*East Peninsula, supra,* 210 Cal.App.3d at pp. 161–162.) The board made an

---

[4] As to the other two school cases discussed above, neither reached the exemption issue. The *Prentiss* court held that the school closure decision was not a project under CEQA. (*Prentiss, supra,* 111 Cal.App.3d at p. 851.) The *South Gate* case involved a transfer of students without a school closure. (*South Gate, supra,* 184 Cal.App.3d at pp. 1423–1424.)

express determination that its decision was exempt from CEQA, under section 21080.18 and Guidelines section 15314. (210 Cal.App.3d at p. 162.) But it did so without undertaking any environmental review. (*Id.* at pp. 172, 173.) The trial court issued a peremptory writ of mandate, commanding the district to void its closure decision and to suspend all related activity "until the District has first analyzed the cumulative environmental effects of this and other school closures and transfers in compliance with CEQA." (*Id.* at pp. 162–163.) In the trial court's view, the "District did not properly evaluate whether its proposed action was exempt from CEQA, a step preliminary to a determination of whether an EIR is required." (*Id.* at p. 163.)

On appeal, the *East Peninsula* court addressed this question: Is the school closure categorical exemption subject to the exception for significant cumulative effects? (*East Peninsula, supra,* 210 Cal.App.3d at pp. 160, 164–165.) Framing its analysis as a matter of statutory interpretation, the court answered the question in the affirmative. (*Id.* at p. 166.) Thus, the court held, "the plain language of section 21080.18 . . . requires an agency to consider the issue of significant effects and cumulative impacts of a transfer of students from a closed school in determining whether the project is exempt from CEQA under that statute." (*Id.* at p. 173.) As the court recognized, its "interpretation of section 21080.18 leads to a situation where the amount of analysis and study involved at the preliminary review stage of determination of whether a project is exempt from CEQA may be similar to that involved at the 'second' stage where the agency conducts an initial study to determine whether the project has a significant effect on the environment [citation]. However, such result is mandated by the statutory language and does not appear to be repugnant to legislative policy." (*Ibid.*)[5]

Turning to the specific case before it, the *East Peninsula* court concluded that the school board "used an incorrect legal standard" in making its exemption determination because it failed to consider the cumulative environmental impacts of its decision. (*East Peninsula, supra,* 210 Cal.App.3d at p. 174.) Furthermore, the court held, the board's "failure to comply with CEQA" was "prejudicial because meaningful information and analysis of cumulative effects and significant environmental effects not occurring at the receptor schools were omitted from the environmental review process." (*Id.* at p. 174.)

---

[5] As the court that decided *East Peninsula* later clarified, however, "we did not hold in *East Peninsula* an agency always must conduct an 'initial study' before declaring a project exempt from CEQA review. Such a holding would run counter to the three-tiered structure of CEQA review under which, if a project is categorically exempt 'no further agency evaluation is required' and no 'initial study' takes place." (*Apartment Assn. of Greater Los Angeles v. City of Los Angeles, supra,* 90 Cal.App.4th at p. 1172.)

d. *Analysis*

We analyze the District's preliminary determination that its decision is exempt from CEQA (1) for compliance with procedural requirements and (2) for evidentiary support. (§ 21168.5; *Association for a Cleaner Environment v. Yosemite Community College Dist., supra,* 116 Cal.App.4th at p. 636.) They are distinct issues: "[I]f a procedural violation of CEQA is shown, the substantial evidence prong of the statutory standard of review does not come into play." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1133 [stating party's contention]; see *No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at pp. 74–75; *Bakersfield Citizens for Local Control v. City of Bakersfield, supra,* 124 Cal.App.4th at p. 1208; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945–946 [91 Cal.Rptr.2d 66].)

SLV CARE challenges the exemption on both grounds. On the first question—procedural compliance—the key issue is timing: The District made its closure decision in April 2003; it approved the filing of a notice of CEQA exemption more than four months later, in August 2003. SLV CARE asserts a procedural violation of CEQA because the District failed to formally invoke the exemption in advance of its closure decision. As to the second question, SLV CARE challenges the evidentiary basis for the decision. We consider each point in turn.

Procedural compliance

 "In granting an exemption, the agency must proceed in the manner prescribed by law, lest it be charged with abusing its discretion." (*Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at p. 842.) "That law consists of CEQA statutes, the Guidelines, and the judicial gloss on both." (*Id.* at pp. 842–843; cf. *Kennedy v. City of Hayward* (1980) 105 Cal.App.3d 953, 962 [165 Cal.Rptr. 132] [in quasi-adjudicatory proceeding, due process principles apply].) Generally speaking, the agency should proceed with a "considered awareness of the purposes and policy" that underlie CEQA; it should not undertake "a mechanical application of the exemption criteria" in reaching its decision. (*Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at p. 843.)

Several legal principles are relevant to the issue of CEQA compliance, including requirements related to timing, documentation, and public comment. In applying these precepts, it is important to distinguish between an exemption determination such as the one made here, which is part of the agency's preliminary review, and a negative declaration or an EIR, which comes into play later in the CEQA analysis.

 As indicated above, the timing rules depend on which step of the CEQA process is involved. In cases involving the second and third tiers of

CEQA analysis, where a negative declaration or an EIR is necessary, the law requires "that environmental issues be considered and resolved *before* a project is approved." (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 75, italics added.) In such cases, courts condemn attempts at after-the-fact rationalizations. (*Id.* at p. 81.) By contrast, determinations made as part of a preliminary, first-tier CEQA review are not formalized until after the project has been approved. Under the Guidelines, a notice of CEQA exemption "shall be filed, if at all, *after* approval of the project." (Guidelines, § 15062, subd. (a), italics added; see *County of Amador v. El Dorado County Water Agency, supra,* 76 Cal.App.4th at p. 962 [notice of exemption was not valid, where it was filed before agency approved the project]; see also, e.g., *Magan v. County of Kings, supra,* 105 Cal.App.4th at pp. 470, 472 [notice of exemption filed one day after action taken]; *Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at pp. 1249, 1250 [same].) Since the District's exemption determination was made as part of a preliminary, first-tier CEQA review, it was not untimely.

As with timing rules, documentation requirements are different for first-tier assessments than for those undertaken later in the CEQA process. When a negative declaration or an EIR is required, it must be in writing. "CEQA impliedly requires (and the guidelines expressly require) that the agency render a written determination whether a project requires an EIR before it gives final approval to that project." (*No Oil, Inc. v. City of Los Angeles, supra,* 13 Cal.3d at p. 75 [post hoc negative declaration]; see Guidelines, § 15362 [defining "environmental documents"].) By contrast, there is no requirement that the agency put its exemption decision in writing. According to the Guidelines, "the agency *may* file a notice of exemption." (Guidelines, § 15062, subd. (a), italics added.) But it is not required to do so: "A notice of exemption has no significance other than to trigger the running of the limitations period." (*Apartment Assn. of Greater Los Angeles v. City of Los Angeles, supra,* 90 Cal.App.4th at p. 1171.) For that reason, "it is irrelevant" whether an exemption notice contains "all that it should under the CEQA guidelines." (*Id.* at p. 1171, fn. 23.)

There are other procedural differences between first-tier review and later CEQA evaluations, including the opportunity for public comment. "CEQA provides for public comment on a negative declaration and an EIR. (§ 21092.) By contrast, CEQA does not provide for a public comment period before an agency decides a project is exempt." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster, supra,* 52 Cal.App.4th at p. 1210.) "Similarly, where an agency approves a project and simultaneously decides that the project is exempt from CEQA, there is no 'public hearing . . . before the issuance of the notice of determination.' " (*Ibid.;* see *City of Pasadena v. State of California, supra,* 14 Cal.App.4th at p. 821 [agency "not required to hold a hearing prior to filing the notice of exemption"].)

 Underlying these differences in procedural rules is a more fundamental concept: CEQA does not apply to exemption decisions. By definition, a "project falling within . . . a categorical exemption is not subject to CEQA." (*Mountain Lion Foundation v. Fish & Game Com., supra,* 16 Cal.4th at p. 124.) For that reason, compliance with the act is not required. "Where a project is categorically exempt, it is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' " (*Association for Protection etc. Values v. City of Ukiah* (1991) 2 Cal.App.4th 720, 726 [3 Cal.Rptr.2d 488] (*Ukiah*); accord, *Magan v. County of Kings, supra,* 105 Cal.App.4th at p. 475.) "Once this determination of threshold exemption is made, . . . none of the CEQA requirements or procedures apply." (*Kennedy v. City of Hayward, supra,* 105 Cal.App.3d at p. 962.)

 To sum up, CEQA has no application to exemption determinations made during an agency's preliminary review, such as the one at issue here. Since CEQA does not apply, compliance with its procedural requirements is not required. Applying that principle here, there is no basis for overturning the District's exemption determination based on claims that it failed to proceed in the manner required by law.

### Substantial evidence

That brings us to the question of whether the challenged categorical exemption is supported by substantial evidence in the administrative record. Our analysis of that question proceeds in two steps: first, we consider the factual predicate for the District's exemption determination; next, we examine evidence supporting the appellant's claim of exceptions to the exemption.

*Exemption*: The first step of the analysis concerns the exemption.

At the administrative level, the agency determines whether the project qualifies for a statutory or categorical exemption from CEQA. (Guidelines, § 15061, subd. (a).) There must be "substantial evidence that the [activity is] within the exempt category of projects." (*Magan v. County of Kings, supra,* 105 Cal.App.4th at p. 475.) That evidence may be found in the information submitted in connection with the project, including at any hearings that the agency chooses to hold. (See *Dehne v. County of Santa Clara, supra,* 115 Cal.App.3d at p. 843 [record of CEQA compliance included applicant's "detailed report" and information presented at five public hearings, "none of which were required by law"].)

When called upon to review an agency's exemption decision, the court's task is to "determine whether, *as a matter of law*, the [activity meets] the definition of a categorically exempt project." (*Santa Monica Chamber of*

*Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 792.) As to that question, "we apply a de novo standard of review, not a substantial evidence standard." (*Ibid;* see also, e.g., *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 573 ["the substantiality of the evidence supporting [quasi-legislative] administrative decisions is a question of law"].) But in undertaking our independent analysis, we bear in mind the "highly deferential" review standard that applies to the agency's factual determinations. (*Western States Petroleum Assn.,* at p. 572.) As our high court has said, "the factual bases of quasi-legislative administrative decisions are entitled to the same deference as the factual determinations of trial courts . . . ." (*Id.* at p. 573.) That deference limits the *scope* of judicial review as well. Generally speaking, the court "may consider only the administrative record in determining whether a quasi-legislative decision was supported by substantial evidence within the meaning of Public Resources Code section 21168.5." (*Ibid.,* fn. omitted.)

Turning to the case at hand, we begin by interpreting the exemption, starting with its plain language. In doing so, we keep in mind that CEQA is concerned only with physical changes to the environment. (Guidelines, § 15358, subd. (b); see, e.g., *City of Pasadena v. State of California, supra,* 14 Cal.App.4th at p. 829.) The interpretation of the exemption presents a question of law. (*Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1251.)

■ By statute, CEQA "does not apply to the closing of [a] public school . . . or the transfer of students from that public school to another school if the only physical changes involved are categorically exempt" under the Guidelines. (§ 21080.18.) From the Guidelines, the pertinent categorical exemption is Class 14, which covers "minor additions to existing schools within existing school grounds where the addition does not increase original student capacity by more than 25% or ten classrooms, whichever is less. The addition of portable classrooms is included in this exemption." (Guidelines, § 15314.)

The critical phrase here is *original student capacity.* (Guidelines, § 15314.) Because CEQA is concerned solely with physical changes to the environment, "student capacity" must refer to the receptor school's physical space for housing students. (Cf. Cal. Code Regs., tit. 2, § 1859.35 ["existing school building capacity" is determined by multiplying number of classrooms times number of students]; compare *East Peninsula, supra,* 210 Cal.App.3d at p. 175 [in dicta, equating receptor school's original student capacity with "previous enrollment"].) We therefore interpret "student capacity" to mean the number of students that can be accommodated physically at the receptor school. That interpretation is bolstered by the juxtaposition of the term "original student

capacity" with the portion of the guideline specifying the maximum number of classrooms: The exemption is available where the addition to the school "does not increase original student capacity by more than 25% *or* ten classrooms, *whichever is less.*" (Guidelines, § 15314, italics added.) By this juxtaposition, the guideline equates student capacity and number of classrooms. That comparison makes no sense unless "student capacity" refers to physical space for housing students. As for the modifier ("original"), we take that to mean the receptor school's capacity as it exists prior to any structural additions to the campus resulting from the project.

To sum up our legal interpretation of the pertinent exemption: A school closure and accompanying transfer of students is exempt from CEQA so long as any resulting physical changes are categorically exempt. (§ 21080.18.) Minor additions to the receptor school are categorically exempt. (Guidelines, § 15314.) A minor addition is defined as the lesser of: (1) the addition of 10 or fewer classrooms; or (2) an increase in original student capacity of 25 percent or less. (*Ibid.*) In this context, original student capacity means the receptor school's preexisting physical ability to house students.

With that interpretation in mind, we next examine the evidence supporting the District's exemption determination. As explained above, the substantiality of that evidence presents a question of law for our independent review. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 573; *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 792.)

To a large extent, the relevant evidence is contained in the March 2003 report of the SSCC task force, which made the closure recommendations. That report contains data about the four individual elementary schools, including their capacity, their student populations, and the number of additional portable classrooms that would be required at each campus for it to operate as a receptor school.

As for the north valley schools, BCE's "current capacity" was listed at 675. BCE's student population then stood at 403; adding Redwood's 288 students would bring the total to 691 pupils at the consolidated campus.[6] The transfer of Redwood students to BCE thus represented an increase in BCE's original student capacity amounting to less than 2.4 percent—far below the 25 percent ceiling spelled out in the Class 14 guideline. (Guidelines,

---

[6] The initial study, which was later prepared by the environmental consultant, reflects slightly different student population numbers than the SSCC reported. The initial study indicates that BCE would gain 249 students, bringing its total enrollment to 649, while SLE would add 350 pupils, for a total enrollment of 718 students. These differences do not affect the availability of the Class 14 categorical exemption.

§ 15314.) In terms of classrooms, BCE would need one additional portable to accommodate consolidation, plus replacements for two others in poor condition. That number likewise falls far below the ceiling of 10 additional classrooms in the guideline. (*Ibid.*)

In the south valley, SLE's indicated capacity was 700. With a student population of 338, plus the transfer of Quail Hollow's 397 students, SLE would end up with 735 pupils.[7] The consolidation of students at SLE thus resulted in an increase in its original student capacity of 5 percent—again, well below the 25 percent maximum set forth in the guideline. (*Ibid.*) As for classrooms, SLE would need three additional portables to accommodate consolidation, plus replacements for another three. That number likewise is below the guideline's ceiling of 10 additional classrooms. (*Ibid.*)

As a matter of law, the foregoing constitutes substantial evidence supporting the District's determination that its closure decision qualifies for a Class 14 categorical exemption from CEQA. (Cf., e.g., *Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1259 [proposed "5,855-square-foot retail/office" qualifies for Class 3 exemption, which allows up 10,000 square feet in urban area].)

*Exception*: The second step in the analytic process addresses exceptions to the categorical exemption.

At the administrative level, once an agency "determines, based on substantial evidence in the record, that the project falls within a categorical exemption . . . , the burden shifts to the challenging party . . . ' "to produce substantial evidence . . ." ' . . . that one of the exceptions to categorical exemption applies." (*Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 796.)

■ The exceptions are contained in Guidelines section 15300.2. As relevant here, that section provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) Thus, a "party challenging an agency's exemption decision must produce substantial evidence that the project has the potential for a substantial adverse environmental impact." (*Ukiah, supra,* 2 Cal.App.4th at p. 728.)

■ In order to warrant application of the exception, the claimed environmental impact must satisfy certain substantive requirements. First, the

---

[7] See footnote 6, *ante.*

impact must constitute a *change* in environmental conditions. (Guidelines, § 15382.) "When reviewing the evidence, we will not consider evidence or arguments about the impact from the *existent . . .* plant." (*Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 993 [63 Cal.Rptr.2d 244] [affirming negative declaration, where there was no evidence that the project would alter the existing effects]; see also, e.g., *Ukiah, supra,* 2 Cal.App.4th at p. 735 [affirming exemption, where there was "no evidence that construction of the house would have any additional effect on runoff"].) Second, the impact must affect the *environment.* For that reason, "we must differentiate between adverse impacts upon particular persons and adverse impacts upon the environment of persons in general." (*Ukiah, supra,* 2 Cal.App.4th at p. 734.) For the exception to apply, there must be evidence that the project "would adversely affect the environment of persons in general." (*Ibid.*) Third, the impact must constitute a *physical* environmental change, as opposed to a social or economic one. (See, e.g., *Citizen Action to Serve All Students v. Thornley, supra,* 222 Cal.App.3d at p. 758.) "The decision to close a popular . . . school is a decision of educational policy with political and social overtones" but our review of that decision "is delimited by the confines of environmental law." (*Id.* at p. 759.) Fourth, there must be a reasonable possibility that the environmental impact will be *significant.* As defined in the Guidelines, that means "a substantial, or potentially substantial, adverse change" resulting from the project. (Guidelines, § 15382.)

Moreover, for the exception to apply, there must be substantial evidence of qualifying environmental impacts. Under the rule generally applicable to CEQA issues, "substantial evidence includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1); see also Guidelines, § 15384, subd. (b).) "Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative, [or] evidence that is clearly inaccurate or erroneous . . . ." (§ 21080, subd. (e)(2); see also Guidelines, § 15384, subd. (a).)

When disputes over the evidentiary basis for an exception become the subject of litigation, the proper review standard must be applied. "There is a split of authority on the appropriate standard of judicial review" when the issue is "the applicability of the Guidelines section 15300.2(c) exception to a project that has been found to fall within a categorical exemption." (*Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1259.) "Some courts have relied on cases involving review of a negative declaration, holding that a finding of categorical exemption cannot be sustained if there is a 'fair argument' based on substantial evidence that the project will have significant environmental impacts, even where the agency is presented with substantial evidence to the contrary." (*Ibid.*) "Other courts apply an ordinary substantial evidence test . . . , deferring to the express or implied findings of the local agency that has found a categorical exemption applicable." (*Id.* at

pp. 1259–1260; see also, e.g., *Ukiah, supra,* 2 Cal.App.4th at p. 728, fn. 7; *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 796; *Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249 [42 Cal.Rptr.3d 537].) We need not resolve that dispute here.

In the case at hand, regardless of what review standard we apply, we find no substantial evidence to support the exception claimed by appellant SLV CARE here. (See *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 796 [even under fair argument standard, challenger failed to demonstrate reasonable possibility of significant environmental effect]; *Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1260 [same].)

With respect to much of the evidence cited by SLV CARE in support of its claims of environmental impacts, it is not clear that it was part of the administrative record, which confines our review. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 573.) The scope of our review is properly limited to the administrative record, even though CEQA procedures may limit a challenger's "opportunity to create a record evidencing potential adverse impacts on the environment." (*Magan v. County of Kings, supra,* 105 Cal.App.4th at p. 477.) But as we now explain, even when all of appellant's evidence is considered, regardless of its source, it does not support a fair argument of significant environmental effects.

We address each ground put forth by SLV CARE as a basis for the claimed exception: (1) mold; (2) geologic hazards; (3) septic failure; and (4) traffic hazards and related issues (parking and emergency access).

(1) Mold: SLV CARE posits a potential "increase in mold due to more bodies [and] opening more rooms," as well as the "potential for adverse reactions to mold due to increase in sensitive receptors." As evidentiary support for those claims, SLV CARE points to a series of letters and reports concerning indoor air quality tests at BCE and other District schools, which were prepared by MACS Lab and signed by its Director of Field Services, Maheen B. Doctor. In early April 2003, Doctor confirmed "slightly elevated levels of some fungal elements," but stated that "the level of elevation is not considered significant." Acknowledging that there are "no established regulatory standards for the determination of 'acceptable' levels of mold" and that "individual sensitivities vary from person-to-person," Doctor continued to recommend "more vigilant housekeeping" to counteract the problem. The presence of mold and mildew in some portable classrooms at BCE also was noted by the SSCC task force in its report.

 Having analyzed the foregoing evidence, we conclude that neither the SSCC information nor the MACS Lab correspondence supports the environmental impact claim urged by SLV CARE. The cited evidence fails on three grounds. First, there is no indication that the presence of mold is a *change* in environmental conditions. The mold was a preexisting condition at BCE, and there is no evidence that it will be exacerbated by the presence of additional pupils. A change in physical conditions is a necessary predicate for a finding of environmental impact. (See *Silveira v. Las Gallinas Valley Sanitary Dist., supra,* 54 Cal.App.4th at p. 993; *Ukiah, supra,* 2 Cal.App.4th at p. 735.) Second, as to the indoor air quality reports and letters, which were signed by Doctor on behalf of MACS Lab, while they suggest that particular individuals may have adverse reactions to mold, they do not demonstrate that school consolidation "would adversely affect the environment of persons in general." (*Ukiah,* at p. 734.) Finally, there is no evidence that any possible environmental impact from the mold will be *significant.* In fact, the evidence is to the contrary—Doctor's letter states that the level of indoor spores "is not considered significant."

(2) Geologic Hazards: SLV CARE identifies geologic dangers as a significant environmental impact, citing a March 1990 letter to the District from a geological consultant, Woodward-Clyde. That letter acknowledges that the Ben Lomond fault lies approximately 100 feet southwest of the BCE campus. But under the heading "CONCLUSIONS," the letter states: "The information obtained during the course of our studies leading to this review appears to justify further downgrading the already minimal risk assigned to construction adjacent to the Ben Lomond fault, which traverses the general area in which the School District is located. We are no longer indicating it to be a potential earthquake source."

Assuming that the cited 1990 letter was part of the administrative record, it does not constitute substantial evidence of environmental impact. Neither that letter nor anything else in the appellate record suggests that any geologic hazard is new, so as to constitute a change in environmental conditions. Nor is there any evidence suggesting that the closure decision amplifies any preexisting hazard, either because of the increase in student population at BCE or because of physical changes on that campus, including the addition of portable classrooms. (See *Citizen Action to Serve All Students v. Thornley, supra,* 222 Cal.App.3d at p. 757 [finding "no evidence in the record" that the school closure "might cause an increased vulnerability to earthquake-related harm" and characterizing arguments to the contrary as mere speculation that "there *might* be such a danger, without hard fact"]; *Ukiah, supra,* 2 Cal.App.4th at p. 735 [rejecting hearsay statements "that the site was on an earthquake fault" and finding that those statements did not constitute substantial evidence to overcome the categorical exemption].)

(3) Septic: As yet another environmental impact, SLV CARE lists septic problems at both receptor schools. As evidentiary support, SLV CARE points to one of the District's five-year maintenance plans; it also cites a February 2002 letter to the District from the California Regional Water Quality Control Board. The maintenance plan, which covers school years beginning in 1997 and ending in 2002, describes the septic fields at SLE and BCE as "failing." The February 2002 letter from the Regional Water Quality Control Board refers to septic problems dating back to 1998 at the District's shared high school campus in Felton. But the administrative record also contains more recent information, which addresses the then-current condition of the septic systems at each of the receptor schools. One such document is an e-mail sent March 31, 2003, from Dave Elliott, the District's Director of Maintenance and Operations, to Julie Haff, the District's Superintendent. In that e-mail, Elliott states: "The septic system at Boulder Creek below the two-story building was replaced in August of 2001 and is working as designed." Elliott also states: "At this time, I see no need for any further improvements to the septic systems at Boulder Creek Elementary." In addition, information presented to the District's Board from the SSCC task force notes both BCE's "new septic" and SLE's "shared septic (new)."

The evidence offered by SLV CARE on this point is deficient in several regards. First, as indicated by the District's more current information, the evidence of septic problems is outmoded. As such, it is "clearly inaccurate or erroneous" and does not constitute substantial evidence. (§ 21080, subd. (e)(2); see also Guidelines, § 15384, subd. (a).) Second, as with appellant's other claims, the proffered evidence does not represent the requisite *change* in environmental conditions. SLV CARE argues that the District failed to "consider the impact of doubling SLE's enrollment on the already failing septic system." But it offers no *evidence* that the claimed problem would be exacerbated by the presence of additional pupils. (See *Magan v. County of Kings, supra,* 105 Cal.App.4th at p. 477 [rejecting challenger's arguments about potential impacts as "based entirely on speculation"].)

(4) Traffic, Parking, Emergency Access: SLV CARE posits the existence of traffic and parking hazards at both receptor schools, citing written public comments by parents of Redwood students. On the issue of traffic, a Redwood parent who routinely ferried children to both of the District's north valley elementary schools wrote: "It takes longer to drop off 1 child at Boulder Creek Elementary (excluding travel time) than it does to drop off 7 children at Redwood (excluding travel time). The hills up to Boulder Creek Elementary are steep and very narrow. There are a lot of pedestrians (mostly children) walking on all sides of these roads. . . . I don't feel this is safe to add more children to this school (Boulder Creek Elementary)." On the issue

of parking, another Redwood parent wrote: "Redwood Elementary has parking for dropping off and picking up students. Parking at Boulder Creek Elementary is minimal, and the facilities for dropping off or picking up students—especially if the student body swells—are both inadequate and dangerous. I expect cars will be lined up around the block." Information from the SSCC's transportation subcommittee reflects some of these same concerns. On the issue of emergency access, SLV CARE cites a letter with attachments, dated March 25, 2003, from Sam Robustelli, Chief of the Boulder Creek Fire Department. That document includes factual comparisons between the north valley schools based on emergency response, fire response, and highway access.

The data and opinions proffered by SLV CARE do not support its claim to the "significant effects" exception to the categorical exemption for school consolidation. As explained above, that exception applies "where there is a reasonable possibility that the activity will have a significant effect on the environment *due to unusual circumstances*." (Guidelines, § 15300.2, subd. (c), italics added.) To sustain the exception, the evidence must show "some feature of the project that distinguishes it" from others in the exempt class. (*Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1260; see also, e.g., *Santa Monica Chamber of Commerce v. City of Santa Monica, supra,* 101 Cal.App.4th at p. 801.)

 SLV CARE offers no evidence that the traffic, parking, or access problems cited here are unusual circumstances in the context of school consolidations. In that respect, this case resembles *Fairbank v. City of Mill Valley*. There, the plaintiff cited "various comments from the administrative record, by which project opponents voiced concerns about the existing traffic and parking problems in downtown Mill Valley, and the prospect of the project exacerbating those problems." (*Fairbank v. City of Mill Valley, supra,* 75 Cal.App.4th at p. 1260.) The court rejected the opponent's claim to an exception, finding "no showing whatsoever of any 'unusual circumstances' surrounding the construction of this small commercial structure giving rise to any risk of 'significant' effects upon the environment. (Guidelines, § 15300.2(c).) While the addition of any small building to a fully developed downtown commercial area is likely to cause minor adverse changes in the amount and flow of traffic and in parking patterns in the area, such effects cannot be deemed 'significant' without a showing of some feature of the project that distinguishes it from any other small, run-of-the-mill commercial building or use. Otherwise, no project that satisfies the criteria set forth in Guidelines section 15303(c) could ever be found to be exempt." (*Ibid.*) As the court concluded, "in the absence of any evidence of unusual circumstances nullifying the grant of a categorical exemption, there can be no basis for a claim of exception under Guidelines section 15300.2(c)." (*Id.* at pp. 1260–1261; see also, e.g., *Ukiah, supra,* 2 Cal.App.4th at p. 736 [the

claimed "potential environmental impacts" were "normal and common considerations in the construction of a single-family residence" and did not constitute unusual circumstances].) The same is true here—there is no evidence of unusual circumstances setting this school consolidation apart from others in the exempt class.

## C. Summary of Conclusions

In this case, we are required to undertake only the first tier of the CEQA analysis. That analysis leads us to the following conclusions: (1) The school consolidation decision at issue here constitutes a "project" for purposes of CEQA. (2) The District properly determined that its decision is exempt from CEQA. First, in making that determination, the District did not violate any procedural requirements of CEQA, because none apply. Moreover, as a matter of law, substantial evidence supports the District's determination that its closure decision qualifies for categorical exemption from CEQA under section 21080.18 and Guidelines section 15314. SLV CARE did not carry its burden of showing an exception to the categorical exemption; it failed to offer sufficient evidence of significant environmental impacts on any of the proffered grounds.

## II. BOND LAW

SLV CARE next argues that the District violated constitutional and statutory provisions governing use of bond funds. At issue is the District's use of proceeds from Measure S, an $18.5 million school facilities bond issue approved by local voters in 2000. As before, we begin by setting forth the relevant legal principles.

## A. General Principles

"The usual method of funding new school construction in California has been for school districts to obtain voter approval for the issuance of general obligation bonds. . . . The bonds are repaid by an annual levy of an ad valorem tax on real (and certain personal) property located within the area of the district." (62 Ops.Cal.Atty.Gen. 209, 210 (1979), fn. and citations omitted.)

Various provisions of law govern school bond financing. Some are constitutional. (See, e.g., Cal. Const., art. XIIIA, § 1, subd. (b); id., art. XVI, § 18.) Others are statutory. (See, e.g., Ed. Code, § 15100 et seq.)[8]

---

[8] In this section of the opinion (pt. II), which discusses bond law, further unspecified statutory references are to the Education Code.

 Generally speaking, school bond financing is restricted to projects of a capital or permanent character. (See *Marin U. Junior College Dist. v. Gwinn* (1930) 106 Cal.App. 12, 13–14 [288 P. 799]; 87 Ops.Cal.Atty.Gen. 157, 162 (2004).) That restriction is apparent from several constitutional provisions. We mention two such provisions, which are instructive because of their detail, although they do not apply directly to this case. First, under the constitutional provision added by Proposition 39, bond proceeds from voter-approved taxes or special assessments may be used only for "the construction, reconstruction, rehabilitation, or replacement of school facilities" and not "for any other purpose, including teacher and administrator salaries and other school operating expenses." (Cal. Const., art. XIIIA, § 1, subd. (b)(3).)[9] Similarly, bonds issued after voter approval to exceed the debt limit may be used only for "the construction, reconstruction, rehabilitation, or replacement of school facilities, including the furnishing and equipping of school facilities, or the acquisition or lease of real property for school facilities. . . ." (Cal. Const., art XVI, § 18, subd. (b).)

There are additional restrictions, including some that are statutory; for example, proceeds "shall not be applied to any other purposes than those for which the bonds were issued." (Ed. Code, § 15146, subd. (b).)

### 1. *Nature of the Relationship Between the District and the Electorate*

According to appellant SLV CARE: "A bond proposition submitted to the voters of a school district is a contract between the district and its voters."

Appellant's characterization does not find universal support in the cases. "The relationship arising out of a bond election has been defined in a number of California cases." (*Associated Students of North Peralta Community College v. Board of Trustees* (1979) 92 Cal.App.3d 672, 676 [155 Cal.Rptr. 250] (*Peralta*).) As explained in the *Peralta* case, some "early decisions" found "a contractual relationship between the public entity and individual electors." (*Ibid.*) "However, a later decision, now regarded as the leading case on the subject, retreated from this classification of the relationship as contractual." (*Ibid.*, citing *Peery v. City of Los Angeles* (1922) 187 Cal. 753 [203 P. 992].) In that later decision, the California Supreme Court "concluded that it was unnecessary to consider the relationship between public entity and electorate as strictly contractual, the status being merely *analogous* to a contract." (*Peralta*, at pp. 676–677.)

---

[9] Proposition 39, enacted in November 2000, "amended the Constitution to allow the issuance of bonds for the construction of school facilities if approved by 55 percent of a school district's voters and if specified conditions are met." (87 Ops.Cal.Atty.Gen., *supra*, at p. 157.) "Normally, approval of a school district's bonded indebtedness would require a two-thirds approval vote of a district's voters." (*Id.* at p. 157, fn. 1.) Legislation implementing Proposition 39 is codified at Education Code sections 15264–15284.

 In any event, precise characterization of the relationship may be academic. "It is clear that proceeds of a bond issue may be expended only for the purpose authorized by the voters in approving issue of the bonds [citation]. Whether the limitation be deemed to be contractual [citation] or of a status analogous to such relation [citation] or a restriction implied by the requirement of popular approval of the bonds [citation], it does restrict the power of the public body in the expenditure of the bond issue proceeds, and hence in the nature of the project to be completed and paid for. The statutes and ordinances under which the public body acts in submitting the bond issue proposal to the voters must be considered with the ballot proposition in determining the extent of this restriction [citations]." (*Mills v. S. F. Bay Area Rapid Transit Dist.* (1968) 261 Cal.App.2d 666, 668 [68 Cal.Rptr. 317].)

## 2. *Elements of the Relationship*

 In *Peralta*, the court identified four elements that typically comprise the relationship between the entity issuing a bond and its voters. (*Peralta, supra*, 92 Cal.App.3d at pp. 677–678.) First, there are the authorizing statutes, which are "presumptively within the knowledge of each elector. . . ." (*Id.* at p. 677.) Second, the "resolution by which the bonding entity resolves to submit the issue to the District's electors has also been regarded as part of the 'contract' between the entity and its electors." (*Ibid.*) "A third element of the 'contract' is the ballot proposition submitted to the voters." (*Ibid.*) "The fourth and final element is assent or ratification" by the voters. (*Id.* at p. 678.)

Depending on the circumstances of the particular case, there may be other factors beyond the four basic elements described above. (*Peralta, supra*, 92 Cal.App.3d at p. 678.) "Extrinsic documents may be added to the primary elements comprising the relationship." (*Ibid.*) But "no case or statutory authority supports the proposed incorporation into the 'bond contract' of the ballot argument submitted to the voters prior to the election." (*Id.* at pp. 678–679.) To the contrary, at least one case has held that "statements 'disseminated to the general public' before the election . . . cannot be deemed to modify the intentionally broad language of the proposition in fact submitted to the voters, the call of election published to them, and the statutes authorizing the procedure adopted [citation]." (*Mills v. S. F. Bay Area Rapid Transit Dist., supra*, 261 Cal.App.2d at p. 669; cf. *Los Angeles County Transportation Com. v. Richmond* (1982) 31 Cal.3d 197, 203 [182 Cal.Rptr. 324, 643 P.2d 941] [in the case of statewide voter initiatives, "ambiguities may be resolved by referring to the ballot summary, the arguments and analysis presented to the electorate, and the contemporaneous construction of the Legislature"]; *City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 52 [184 Cal.Rptr. 713, 648 P.2d 935] [same].)

## B. Application

The *Peralta* case provides a useful approach for assessing appellant's argument that the District violated its bond obligations. We therefore begin our analysis by applying each of the elements identified in *Peralta* to the relationship between the District and the voters arising out of the November 2000 bond election. (See *Peralta, supra,* 92 Cal.App.3d at pp. 677–679.) We then discuss the specific violations claimed by SLV CARE. Because the relevant facts are not in dispute, the issues presented are questions of law, which we review de novo. (See, e.g., *Service Employees Internat. Union v. Board of Trustees* (1996) 47 Cal.App.4th 1661, 1665 [55 Cal.Rptr.2d 484] [interpreting Education Code provisions].)

### 1. *Elements*

 The first of the elements that make up the entity-electorate relationship is the authorizing legislation. (*Peralta, supra,* 92 Cal.App.3d at p. 677.) Here, the relevant statute is Education Code section 15100, which permits school districts to seek bond financing for a variety of purposes, including: (a) buying school land; (b) buying or constructing school buildings; (c) making "alterations or additions" to school buildings other than "current maintenance, operation, or repairs"; (d) "repairing, restoring, or rebuilding . . . any school building damaged, injured, or destroyed by fire or other public calamity"; (e) acquiring "furniture, equipment, or necessary apparatus of a permanent nature"; and (f) permanently improving school grounds. (Ed. Code, § 15100, subds. (a)–(f).)[10] The statutorily authorized purposes thus are broad but not limitless, being generally restricted to capital or permanent items.

The second element is the District's formal resolution to submit the issue to the electors. (*Peralta, supra,* 92 Cal.App.3d at p. 677; see Ed. Code, § 5322.) In the preamble of its July 2000 resolution, the District indicated its desire "to improve school facilities to benefit students in the District." In the body of the resolution, the District formally determined to submit to the electorate "the question of whether the Bonds shall be issued and sold for the purpose of raising money to finance the School Facilities and paying costs incident thereto." The stated purpose of the election was "for the voters in the District to vote on a proposition, a copy of which is attached hereto . . . containing the question of whether the District shall issue the Bonds for the purposes stated therein." The resolution thus speaks broadly of funding school facilities and incidental costs.

---

[10] Education Code section 15100 provides in full as follows: "Except as otherwise provided by law, the governing board of any school district or community college district may, when in its judgment it is advisable, and shall, upon a petition of the majority of the qualified electors

The third consideration is the ballot proposition itself. (*Peralta, supra,* 92 Cal.App.3d at p. 677; see Ed. Code, § 15122 [requirements as to the form of the ballot].) Measure S, put before the voters in the November 2000 election, was phrased as follows: "To acquire, construct, and modernize school facilities, build new [classrooms] to replace 30-year-old portables, construct a permanent Junior High at the current site, upgrade drainage, replace deteriorating plumbing and inadequate electrical systems, improve student access to classroom computers and technology, and make the District eligible to receive over $8 million in state-matching funds, shall the San Lorenzo Valley Unified School District be authorized to issue $18,500,000 of bonds at an interest rate below the legal limit?"

Those three elements—the statute, the resolution, and the ballot proposition—were before the voters considering Measure S. "The fourth and final element is assent or ratification by the electors, which, of course, is present here." (*Peralta, supra,* 92 Cal.App.3d at p. 678.)

In this case, there are no other factors that bear on the District-electorate relationship. (See *Peralta, supra,* 92 Cal.App.3d at pp. 678–679.) More specifically, contrary to the contentions of appellant SLV CARE, ballot arguments are not part of the analysis. (*Ibid.; Mills v. S. F. Bay Area Rapid Transit Dist., supra,* 261 Cal.App.2d at p. 669; cf. *Los Angeles County Transportation Com. v. Richmond, supra,* 31 Cal.3d at p. 203 [state voter initiatives].)

---

residing in the school district or community college district, order an election and submit to the electors of the district the question whether the bonds of the district shall be issued and sold for the purpose of raising money for the following purposes:

"(a) The purchasing of school lots.

"(b) The building or purchasing of school buildings.

"(c) The making of alterations or additions to the school building or buildings other than as may be necessary for current maintenance, operation, or repairs.

"(d) The repairing, restoring, or rebuilding of any school building damaged, injured, or destroyed by fire or other public calamity.

"(e) The supplying of school buildings and grounds with furniture, equipment, or necessary apparatus of a permanent nature.

"(f) The permanent improvement of the school grounds.

"(g) The refunding of any outstanding valid indebtedness of the district, evidenced by bonds, or of state school building aid loans.

"(h) The carrying out of the projects or purposes authorized in Section 17577 or 81613.

"(i) The purchase of schoolbuses the useful life of which is at least 20 years.

"(j) The demolition or razing of any school building with the intent to replace it with another school building, whether in the same location or in any other location.

"Any one or more of the purposes enumerated, except that of refunding any outstanding valid indebtedness of the district evidenced by bonds, may, by order of the governing board entered in its minutes, be united and voted upon as one single proposition."

### 2. *Claimed Violations*

#### a. *Promise of Matching Funds*

As set forth in the ballot, one of the purposes of Measure S was to "make the District eligible to receive over $8 million in state-matching funds . . . ." According to appellant SLV CARE, that language triggered the application of Education Code, section 15122.5, which requires a statement in the sample ballot advising voters that the project is subject to discretionary state approval. In appellant's words: "In promising that approval of the bond measure would bring 'over $8 million in state-matching funds' without the required discretionary approval language, Respondent violated . . . § 15122.5."

To properly assess appellant's contention, we begin with the statute. In pertinent part, Education Code section 15122.5 provides: "Whenever . . . the project to be funded by the bonds will require state matching funds for any phase of the project, the sample ballot shall contain a statement . . . advising the voters that the project is subject to the approval of state matching funds and, therefore, passage of the bond measure is not a guarantee that the project will be completed." (§ 15122.5, subd. (a).)[11]

 Based on the statute's plain language, we reject appellant's contention. Education Code section 15122.5 requires voter advisement when "the project to be funded by the bonds *will require state matching funds* . . . ." (§ 15122.5, subd. (a), italics added.) Neither the language of Measure S, nor any other evidence in the record, suggests that the bond-financed projects *required* state matching funds. Becoming "eligible to receive" state funds for Measure S projects is not the same as requiring such funds.

In short, we find no violation of Education Code section 15122.5.

---

[11] The full text of Education Code section 15122.5 reads: "(a) Whenever an election is called on the question of whether bonds of a school district shall be issued and sold for the purposes specified in Section 15100 and the project to be funded by the bonds will require state matching funds for any phase of the project, the sample ballot shall contain a statement, as provided in subdivision (b), advising the voters that the project is subject to the approval of state matching funds and, therefore, passage of the bond measure is not a guarantee that the project will be completed.

"(b) The words to appear in the sample ballot in satisfaction of the requirements of subdivision (a) are as follows:

" 'Approval of Measure _____ does not guarantee that the proposed project or projects in the _____ School District that are the subject of bonds under Measure _____ will be funded beyond the local revenues generated by Measure _____. The school district's proposal for the project or projects may assume the receipt of matching state funds, which could be subject to appropriation by the Legislature or approval of a statewide bond measure.'

"(c) This section does not apply to any election to incur bonded indebtedness pursuant to the Mello-Roos Community Facilities Act of 1982 contained in Chapter 2.5 (commencing with Section 53311) of Division 2 of Title 5 of the Government Code."

b. *Expenditures*

SLV CARE challenges a number of the District's expenditures as unauthorized uses of the bond funds.[12] To streamline our discussion of this issue, we group the challenged expenditures into logical categories.

Administrative costs: The resolution adopted by the District identified the purpose of the bond as "raising money to finance the School Facilities and paying costs incident thereto."

Incidental costs include the expense of administering and overseeing construction projects to be funded with bond money. As stated in a 2004 Attorney General opinion, which concerned the use of Proposition 39 bond funds: "Administrative oversight work is an integral part of the construction process." (87 Ops.Cal.Atty.Gen., *supra,* at p. 163.) As the Attorney General further explained, "the phrase 'the construction, reconstruction, rehabilitation, or replacement of school facilities' embraces project administrative costs, such as monitoring contracts and project funding, overseeing construction progress, and performing overall project management and accounting that facilitates timely completion of the construction project. A construction project generates not only the costs of materials and equipment, architectural and engineering design work, and construction worker salaries, but also costs of project administration—work that the school district would not be required to undertake or to fund *but for* the existence of the construction project." (*Id.* at p. 160.)

As the Attorney General recognized, analogous statutes bolster that conclusion. (See 87 Ops.Cal.Atty.Gen., *supra,* at pp. 162–163.) Among them is Government Code section 16727, which concerns issuance of the state's general obligation bonds. (87 Ops. Cal. Atty. Gen, at pp. 162–163.) According to subdivision (a) of that section: "Proceeds from the sale of any bonds . . . shall be used only for the following purposes: (a) The costs of construction or acquisition of capital assets." (Gov. Code, § 16727, subd. (a).) After defining capital assets, subdivision (a) continues: "Costs allowable under this section include costs incidentally but directly related to construction or acquisition, including, but not limited to, planning, engineering, construction management, architectural, and other design work, environmental impact reports and

---

[12] In its opening brief, SLV CARE lists the following items as unauthorized expenditures: "a demographic study and 'geocoding' of student addresses used for the school closure project; printing the bond measure materials; deferred maintenance . . . [¶] costs associated with consolidation [of] schools including moving and leasing portable[] classrooms, consultants, mold reports, and the belated CEQA study; the salary of the ex-Principal of Redwood Elementary, who was hired as Bond Manager, including his attendance and training at conferences, and 15% of the salary of the CFO; payments to consultants, attorneys, and other professionals; and repair of the Felton campus septic system."

assessments, required mitigation expenses, appraisals, legal expenses, site acquisitions, and necessary easements." (*Ibid.*) Under subdivision (d), proceeds also may be used to "pay the costs of a state agency with responsibility for administering the bond program." (*Id.,* subd. (d).)

As relevant to the challenges raised here, permissible administrative costs would include the salaries of in-house personnel acting as construction project administrators. (87 Ops.Cal.Atty.Gen., *supra,* at p. 158.) Administering the project "is an integral part of the construction process." (*Id.* at p. 163.) Administration may be provided by outside contractors or in-house personnel. "School district employees with the requisite expertise may be able to perform project management work at less cost to the district than if the work were performed by private consultants." (*Id.* at p. 162.) For these reasons, the prohibition against the use of "Proposition 39 school bond proceeds for 'teacher and administrator salaries and other school operating expenses' " does not apply "to the payment of salaries of school district employees who perform administrative oversight work on construction projects authorized by a voter approved bond measure." (*Id.* at p. 158, quoting Cal. Const., art. XIIIA, § 1, subd. (b)(3)(A); cf. § 17074.10 [school modernization funds available under the Leroy F. Green School Facilities Act of 1998 "do not include funding for administrative and overhead costs"].)

 In sum, costs that are "incidentally but directly related to construction or acquisition" may be paid from proceeds of the state's general obligation bonds. (Gov. Code, § 16727, subd. (a).) That includes administrative costs, such as salaries for personnel engaged in construction management and oversight. (87 Ops.Cal.Atty.Gen., *supra,* at pp. 162–163.)

Applying those concepts here, to the District's general obligation bonds, we reject the claim by SLV CARE that the salaries and associated training costs of the District's personnel were improper. There is no evidence that those expenditures were made for purposes other than management and oversight of those District construction projects that were funded by bond money. To the contrary, the unrebutted trial testimony shows that the challenged salary expenses in fact represent construction management. For example, District Superintendent Julie Haff testified that the facilities manager was "paid with bond funds" because "his job is strictly to supervise the spending of the construction funds, and it's totally dedicated to construction and our efforts to acquire and modernize our school facilities." The facilities manager's own testimony was to the same effect: Bryan Loehr stated that his job was to "manage all of the construction and modernization projects that are funded by the general obligation bonds and by the State modernization fund." In explaining the use of bond funds to pay 15 percent of the salary of the District's assistant superintendent of business services, Edith Henden,

Superintendent Haff testified, "that's her time dedicated to the expenditure of these bond funds for acquiring and modernizing our facilities."

Bond preparation costs: Appellant SLV CARE also challenges expenses incurred in preparing the bonds, such as printing and attorney fees. According to appellant: "Bond proceeds may not be used to pay even the 'soft costs' of the bond measure such as printing, publication and even the bond attorney's opinion."

In support of its argument, appellant relies on a 1958 opinion of the Attorney General. (32 Ops.Cal.Atty.Gen. 249 (1958).) That opinion concludes that the expenses of printing the bonds and related publications, and the cost of the bond attorney's opinion, are "payable out of the general funds of the district, not out of bond proceeds." (*Id.* at p. 249.)

We do not find the proffered authority persuasive. The 1958 Attorney General opinion cited by appellant was based on quoted language of a provision of the 1943 Education Code, which has since been repealed. (Ed. Code, former § 7435; see now § 15145.) Under the repealed provision, expenses incurred for preparation of the bond constituted "a legal charge against the funds of the school district issuing the bonds." (Former § 7435.) The Attorney General interpreted the statutory reference to funds to mean the district's *general* funds, not *bond* proceeds. (32 Ops.Cal.Atty.Gen., *supra,* at p. 250.) But the Attorney General did "concede that the matter is not free from doubt." (*Ibid.*) More to the point, subsequent changes in the statutory language completely undermine the Attorney General's interpretation.

In pertinent part, the governing statute now reads: "All expense incurred for the preparation, sale, and delivery of the school bonds, including but not limited to, fees of an independent financial consultant, the publication of the official notice of sale of the bonds, the preparation, printing and distribution of the official statement, the obtaining of a rating, the purchase of insurance insuring the prompt payment of interest and principal, the preparation of the certified copy of the transcript for the successful bidder, the printing of the bonds, and legal fees of independent bond counsel retained by the school district or community college district issuing the bonds are legal charges against the funds of the district issuing the bonds and *may be paid from the proceeds of sale of the bonds.*" (Ed. Code, § 15145, subd. (a), italics added; cf. Gov. Code, § 16727, subd. (e) [proceeds from the state's general obligation bonds may be applied to the "costs of the Treasurer's office directly associated with the sale and payment of the bonds, including, but not limited to, underwriting discounts, costs of printing, bond counsel, registration, and fees of trustees"].)

Based on the statute's plain language, we find no merit in appellant's broad challenge to bond preparation expenses such as printing and counsel fees. Nor does SLV CARE offer evidence that particular expenditures within that category were improper. We therefore reject appellant's claim that these expenditures were unauthorized.

Construction costs: Appellant SLV CARE takes issue with the District's use of bond funds for certain construction projects, characterizing them as unauthorized uses of the bond proceeds. Specifically, appellant cites deferred maintenance and repair of the septic system on the Felton campus.

An underlying theme of these challenges is the distinction between permanent, capital improvements on the one hand, and operation and maintenance on the other. (*Marin U. Junior College Dist. v. Gwinn, supra,* 106 Cal.App. at pp. 13–14 [school bonds restricted to capital projects].) In urging that distinction, appellant directs us to article XIIID of the California Constitution, which defines both concepts: " 'Capital cost' means the cost of acquisition, installation, construction, reconstruction, or replacement of a permanent public improvement by an agency." (Cal. Const., art. XIIID, § 2, subd. (c).) " 'Maintenance and operation expenses' means the cost of rent, repair, replacement, rehabilitation, fuel, power, electrical current, care, and supervision necessary to properly operate and maintain a permanent public improvement." (*Id.,* subd. (f).)

Armed with those concepts, appellant SLV CARE mounts a general challenge to District expenditures that it categorizes as deferred maintenance. As authorized elsewhere in the Education Code, a school district "may establish a restricted fund to be known as the 'district deferred maintenance fund' for the purpose of major repair or replacement of plumbing, heating, air conditioning, electrical, roofing, and floor systems, the exterior and interior painting of school buildings," for removing asbestos and lead, and for "other items of maintenance approved by the State Allocation Board." (Ed. Code, § 17582, subd. (a).) Money deposited to the deferred maintenance fund "may be received from any source whatsoever," but it must "be accounted for separately from all other funds and accounts . . . ." (*Ibid.*)

According to appellant, the District "made no effort to determine which, if any deferred maintenance projects might qualify for use of bond moneys. Bond money transferred into the deferred maintenance account was used indiscriminately for anything that qualified as deferred maintenance." SLV CARE does not identify specific improper items, however.

We reject appellant's unfocused substantive challenge, which fails to identify—much less support—specific improper deferred maintenance expenses. Dealing in generalities, as we must, we conclude that the expenditures for deferred maintenance were proper. First, under the governing statute, authorized bond projects include "alterations or additions to the school building or buildings other than as may be necessary for *current* maintenance. . . ." (Ed. Code, § 15100, subd. (c), italics added.) Appellant fails to demonstrate that the District paid for any *current* maintenance items with *deferred* maintenance bond funds. Second, as to the ballot language, Measure S specifically sought money for "modernization." There is no evidence that any deferred maintenance project falls outside that rubric.

Appellant SLV CARE also alleges the District's misuse of bond funds based on transfers between its accounts. In its opening brief, SLV CARE charges that "a large portion of the bond money transferred into the deferred maintenance account was again transferred into the general fund where it was used for general operational expenses, including salaries." In its reply brief, SLV CARE asserts that the District once "transferred $85,905 in bond money into the general fund to cover a deficit." In support of that assertion, appellant cites testimony by Edith Henden, the District's assistant superintendent of business services, who testified concerning entries in the District's June 2002 audited financial statements.

While the cited evidence does show that funds were transferred between accounts, it does not demonstrate impropriety. As SLV CARE points out, Henden did acknowledge that $104,000 in bond funds had been "transferred out of the building fund and into deferred maintenance account" and also that there had been a transfer "from the deferred maintenance fund to the general fund" amounting to nearly $86,000. But as she explained, the transfer represented an "audit adjustment" entry to avoid an impermissible year-end deficit, and the money was transferred back.[13] SLV CARE cites no other evidence of impropriety, and the trial court found none. Appellant's claim of statutory violations in connection with the District's transfers of deferred maintenance funds thus fails for lack of evidentiary support.

Apart from its deferred maintenance claims, SLV CARE also takes issue with the use of bond funds to repair the septic system at the Felton campus.

---

[13] Henden was asked: "Would it have been possible to transfer $85,905 into the general account from deferred maintenance if, in fact, this 104,000 from the bond money hadn't been there?" She responded: "I want to say yes, but I think I need to expand a little bit. You can't have—you can't end the year with a deficit in this fund. So the general fund would have—essentially, the transfer would have been made because it's an audit exception, an audit adjustment that needed to be made. So we would have booked it; then we would have transferred funds back from—to the general fund to cover it."

We reject that contention as well. As before, we look first to the statute. Among the permissible purposes for bond funds is the "carrying out of the projects or purposes authorized in Section 17577 . . . ." (Ed. Code, § 15100, subd. (h).) That section in turn provides that a "school district may provide sewers and drains adequate to treat and/or dispose of sewage and drainage on or away from each school property." (Ed. Code, § 17577.) It further provides: "The cost thereof may be paid from the building fund, including any bond moneys therein." (*Ibid.*) Repair of the septic system thus is proper under the statute. It is also proper under the language of Measure S, either as a means to "modernize school facilities" or under the measure's plan to "replace deteriorating plumbing."

Consolidation costs: Appellant's final challenge is to expenses associated with the school closures and consolidation: demographic and geocoding studies; consultants; mold reports; the CEQA study; and the moving and leasing of portable classrooms.

With respect to the consultants and studies, we again find guidance in the state's general obligation bond law. (See Gov. Code, § 16727.) It permits bond funds to be used for "costs incidentally but directly related to construction or acquisition, *including, but not limited to, planning*, engineering, construction management, architectural, and other design work, *environmental impact reports and assessments*, required mitigation expenses, appraisals, legal expenses, site acquisitions, and necessary easements." (*Id.,* subd. (a), italics added.) Applying that statute here, the costs for studies and consultants must be upheld. The demographic studies represented planning expenses, which helped the District determine where to construct or improve facilities. The mold reports served a similar planning function. And the CEQA study falls within the rubric of an environmental impact assessment.

As for the moving and leasing of portable classrooms, SLV CARE argues: "Bond law does not allow Measure S money to be used to lease anything."

That argument cannot be supported. As explained in a 1979 Attorney General opinion, there are various methods of "funding new school construction in California . . . ." (62 Ops.Cal.Atty.Gen., *supra,* at p. 210.) One "alternative for constructing new school facilities has been the use of 'lease-purchase agreements.' " (*Ibid.,* citing Ed. Code, §§ 39300–39305 [repealed; see now Ed. Code, §§ 17400–17404, 17406].) As that opinion suggests, school districts may acquire new school facilities through leasing arrangements. Education Code section 17400 thus authorizes "leases and agreements relating to real property and buildings." Section 17405 provides that "relocatable" structures may constitute school buildings, and it authorizes the lease of such structures subject to enumerated statutory requirements.

Other sections likewise implicitly recognize that "construction of a school building" may be accomplished with a "factory-built school building." (Ed. Code, § 17357; see also, e.g., Ed. Code, §§ 17352, 17358.)

 In short, there is no legal basis for appellant's argument that the installation of leased portable classrooms does not qualify as construction of school facilities. Under the statute, it constitutes the "building . . . of school buildings." (Ed. Code, § 15100, subd. (b).) Under the language of Measure S, it falls within the stated purpose to "acquire [or] construct . . . school facilities."

### C. Summary of Conclusions

We find no violation of bond law in connection with Measure S. Contrary to the contention of appellant SLV CARE, the fact that one of the express purposes of Measure S was to "make the district eligible to receive over $8 million in state matching funds" did not trigger the advisory requirements of Education Code section 15122.5. On the separate question of the District's expenditures from bond proceeds, we likewise reject appellant's challenges to administrative costs, including salaries, bond preparation expenses, specific construction projects, and school consolidation expenses. Neither the law nor the record supports those claims.

### III. DISCLOSURE OF PUBLIC RECORDS

SLV CARE next contends that the District violated two state statutes requiring the disclosure of public records: the California Public Records Act (CPRA) and the Ralph M. Brown Act (Brown Act).[14] As with our analysis of the preceding issues, we start by describing the governing legal principles.

### A. General Principles

1. *The California Public Records Act*

"In 1968, the Legislature clarified the scope of the public's right to inspect public records by enacting the CPRA." (*County of Los Angeles v. Superior Court* (2000) 82 Cal.App.4th 819, 825 [98 Cal.Rptr.2d 564].) The act is codified at Government Code section 6250 et seq.

a. *Policy and Operation*

The CPRA "was enacted for the purpose of increasing freedom of information by giving members of the public access to information in the possession

---

[14] In this section of the opinion (pt. III), which concerns the CPRA and the Brown Act, further unspecified statutory references are to the Government Code.

of public agencies." (*Filarsky v. Superior Court* (2002) 28 Cal.4th 419, 425–426 [121 Cal.Rptr.2d 844, 49 P.3d 194], citing *CBS, Inc. v. Block* (1986) 42 Cal.3d 646, 651 [230 Cal.Rptr. 362, 725 P.2d 470].) "The CPRA embodies a strong policy in favor of disclosure of public records . . . ." (*California State University, Fresno Assn., Inc. v. Superior Court* (2001) 90 Cal.App.4th 810, 831 [108 Cal.Rptr.2d 870].) Public records are broadly defined. (*Id.* at p. 824; see Gov. Code, § 6252, subd. (e).)

 "A state or local agency, upon receiving a request by any person for a copy of public records, generally must determine within 10 days whether the request seeks public records in the possession of the agency that are subject to disclosure." (*Filarsky v. Superior Court, supra,* 28 Cal.4th at p. 426, citing Gov. Code, § 6253, subd. (c).) "The Act includes protections and incentives for members of the public to seek judicial enforcement of their right to inspect public records subject to disclosure." (*Id.* at p. 427; see *id.* at pp. 427–428, discussing Gov. Code, § 6259 [fee provisions].)

 Despite the strong legislative policy favoring access, "the public's right to disclosure of public records is not absolute. In California, the Act includes two exceptions to the general policy of disclosure of public records: (1) materials expressly exempt from disclosure pursuant to section 6254; and (2) the 'catchall exception' of section 6255, which allows a government agency to withhold records if it can demonstrate that, on the facts of a particular case, the public interest served by withholding the records clearly outweighs the public interest served by disclosure." (*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1017 [88 Cal.Rptr.2d 552], fns. omitted.) But "unless exempted, all public records may be examined by any member of the public, often the press, but conceivably any person with no greater interest than idle curiosity." (*Marylander v. Superior Court* (2000) 81 Cal.App.4th 1119, 1125 [97 Cal.Rptr.2d 439].)

b. *Judicial Review*

 "The Act sets forth specific procedures for seeking a judicial determination of a public agency's obligation to disclose records in the event the agency denies a request by a member of the public." (*Filarsky v. Superior Court, supra,* 28 Cal.4th at p. 426, discussing Gov. Code, § 6258.) The act includes a provision "directing the trial court in a proceeding under the Act to reach a decision as soon as possible (§ 6258)," as well as a "provision for expedited appellate review (§ 6259, subd. (c))," which "reflect a clear legislative intent that the determination of the obligation to disclose records requested from a public agency be made expeditiously." (28 Cal.4th at p. 427.)

As for appellate review, "an order of the trial court under the Act, which either directs disclosure of records by a public official or supports the official's refusal to disclose records, is immediately reviewable by petition to the appellate court for issuance of an extraordinary writ." (*City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1016.) "The standard for review of the order is 'an independent review of the trial court's ruling; factual findings made by the trial court will be upheld if based on substantial evidence.' " (*Ibid.,* citing *Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1336 [283 Cal.Rptr. 893, 813 P.2d 240]; accord, *California State University, Fresno Assn., Inc. v. Superior Court, supra,* 90 Cal.App.4th at p. 824.)

### 2. The Brown Act

"The Brown Act (§ 54950 et seq.) provides for open meetings for local legislative bodies such as city councils, boards of supervisors and school boards." (*Ingram v. Flippo* (1999) 74 Cal.App.4th 1280, 1287 [89 Cal.Rptr.2d 60].)

### a. Policy and Operation

As the Legislature explicitly declared in enacting the Brown Act, "public agencies in this State exist to aid in the conduct of the people's business. It is the intent of the law that their actions be taken openly and that their deliberations be conducted openly." (Gov. Code, § 54950.) "A major objective of the Brown Act is to facilitate public participation in all phases of local government decisionmaking and to curb misuse of democratic process by secret legislation by public bodies." (*Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 555 [35 Cal.Rptr.2d 782].)

"Numerous provisions of the Act combine to ensure public notice of and access to meetings of legislative bodies." (*Ingram v. Flippo, supra,* 74 Cal.App.4th at p. 1287.) As relevant here, the Brown Act accords public record status to certain writings distributed for consideration at the public meeting of an agency's legislative body, including the agenda. (Gov. Code, § 54957.5.)

### b. Judicial Review

Several avenues of judicial relief are available to address violations of the Brown Act. "To assist in enforcement of the open meeting laws, the Act provides for criminal penalties and civil injunctive or declaratory relief. (§§ 54959, 54960.)" (*Ingram v. Flippo, supra,* 74 Cal.App.4th at p. 1287; see also, e.g., *California Alliance for Utility etc. Education v. City of San Diego*

(1997) 56 Cal.App.4th 1024, 1030 [65 Cal.Rptr.2d 833] [plaintiff is entitled to declaratory relief where an actual controversy exists over "past compliance with the Brown Act"].) "In addition, actions taken in violation of the Brown Act may be declared null and void by a court. (§ 54960.1.)" (*Ingram v. Flippo, supra,* 74 Cal.App.4th at p. 1287.)

Even where a plaintiff has satisfied the threshold procedural requirements to set aside an agency's action, Brown Act violations will not necessarily "invalidate a decision. [Citation.] Appellants must show prejudice." (*Cohan v. City of Thousand Oaks, supra,* 30 Cal.App.4th at pp. 555–556 [no prejudice shown from violation of Gov. Code, § 54954.2, subd. (a), which "requires that an agenda be posted at least 72 hours before a regular meeting and forbids action on any item not on that agenda"].)

## B. Application

With those principles in mind, we turn to the three specific contentions raised by appellant SLV CARE: (1) that the trial court erred in failing to find violations of the CPRA; (2) that the trial court should have granted relief under the Brown Act; and (3) that the trial court committed prejudicial error in excluding testimony from David Churchill about those violations.

### 1. *Background*

SLV CARE made a number of written requests for public records relating to the closure decision, initially through its first attorney Steven A. Greenburg. The District responded to those requests. In its statement of decision, the trial court detailed the relevant chronology of request and response. To summarize, Greenburg wrote letters in June, July, and August 2003 requesting documents and demanding that the District cure its claimed disclosure violations. The District forwarded more than 400 pages of records to Greenburg in July, and it provided him with additional documents the following month. A separate request for documents was e-mailed to the District by David Churchill.

There was trial evidence concerning the scope of the requests and the extent of the District's compliance. SLV CARE sought to elicit Churchill's testimony about his request for public records and the District's refusal to comply, but the trial court excluded that evidence because Churchill did not identify himself as a member of SLV CARE when he made the request.

In its statement of decision, the trial court observed: "There were no complaints of incomplete production in any of the correspondence except Mr. Greenburg's unexplained continued requests for the same exhibits already produced to Greenburg" and to appellant's trial counsel. After describing the District's compliance with respect to specific requested items, the trial court expressly found "insubstantial evidence of failure to produce documents in a timely manner" under either the CPRA or the Brown Act.

2. *The California Public Records Act*

As to disclosure under the CPRA, SLV CARE asserts that there is "unrebutted evidence" that the District "refused to fully comply with its obligations."

Based on our review of the evidentiary record, we disagree.

As one example of disclosure violations, SLV CARE cites the testimony of the District's superintendent, Julie Haff, asserting: "She admitted to producing e-mails at her deposition that she had not produced in response to the Records Act request." But in the cited testimony, Haff clarified that she had "a practice of reading e-mails and deleting them." As a result of that practice, Haff believed that she "had no e-mails." But she later discovered that her laptop computer "was actually saving some e-mails that I had received that I sent a response to. Those were the only e-mails I had. I did not know that I had them."

As the trial court properly determined, the cited testimony is insubstantial evidence of failure to timely produce available documents.

As a second example, appellant SLV CARE points to testimony by facilities manager Loehr that "he had custody of the bond budget file" but that Superintendent Haff "did not ask him to produce that file in response to the record request." Appellant likewise asserts that the District's assistant superintendent, Don Fox, "had financial documents that were responsive to the records request . . . but he failed to produce them."

The problem with these contentions is that nothing about the bond budget file or related financial information was ever mentioned in any of the requests made by attorney Greenburg, who was the only person purporting to represent SLV CARE. (David Churchill did request information about bond expenditures, but he did so without mentioning any relationship to SLV CARE.) Initially, Greenburg specified only documents relating to two board meetings: the one in April 2003, when the Board made its closure decision, and the one in June 2003, when the Board rejected private funding to keep

Redwood Elementary open for another year. His later requests sought tapes, agendas, and minutes from all meetings of the SSCC task force and of the Board held between June 2002 and August 2003. But at no time did Greenburg's correspondence indicate that he was seeking information about the bond or other financial issues. In the absence of evidence that SLV CARE requested financial documents, there can be no statutory violation with respect to this information.

SLV CARE also charges the District with unlawfully refusing to turn over available geologic reports. As evidentiary support for that claim, appellant again cites testimony by Julie Haff, the District's superintendent. As appellant characterizes that testimony, "her maintenance director had geologic reports that were responsive to Appellant's records request. She asked for these reports, but never obtained them." Haff's trial testimony does not support appellant's characterization. After being shown a 1985 geologic report, Haff was asked whether she had ever seen it before. She responded: "I don't believe I have, no." She was then asked, "where you would likely find that?" Her response was: "This would most likely be found with the Director of Maintenance." Haff then confirmed that she had asked the maintenance director to "turn over his files" prior to the school closures, but that he had not done so.

Significantly, however, there is no evidence that the maintenance director's files contained the requested 1985 geologic report. Haff testified only that such a report "likely" would be in those files. There is no evidence that it was.

The final asserted instance of violation relates to internal documents. According to appellant SLV CARE, it "sought internal documents used to evaluate the schools being targeted for closure. Ms. Haff testified that she did not produce any internal records in response to the record request." SLV CARE further maintains: "Not until shortly before trial were any internal records produced."

Again, however, the record fails to support appellant's contention. Turning first to the superintendent's testimony, she stated that she had no additional internal documents to produce. She was asked at trial: "Are there no internal District documents on the issue of the closure of Redwood School other than what's in the public record?" She answered: "No, there are no other records. I've taken what I—I mean, a year and a half ago, I took what I had and I put it into power point presentations. Those became part of the public record. That's what I maintained." Turning next to appellant's claim that responsive internal documents were available but withheld until shortly before trial, SLV CARE offers no citation to the record to support that claim, and our review of the record reveals no such evidence.

As explained above, on appellate review of claims under the CPRA, we uphold the trial court's factual findings to the extent that they are based on substantial evidence. (*City of San Jose v. Superior Court, supra,* 74 Cal.App.4th at p. 1016.) Here, the trial court determined that SLV CARE produced "insubstantial evidence" of CPRA violations. On this record, we agree.

### 3. *The Brown Act*

Appellant SLV CARE asserts Brown Act violations based on its claim that it was not provided with all of the public records given to members of the District's Board at public meetings. (See Gov. Code, § 54957.5.)

Appellant's Brown Act claim fails for the same reasons as its CPRA claim. As just explained, the trial court determined that the District had complied with all of the relevant public records requests, and that determination finds adequate support in the record.

### 4. *Excluded Testimony*

Appellant SLV challenges the trial court's decision to exclude David Churchill's proffered testimony to the extent that it concerned his requests to the District for public records.

The trial court's decision was made in response to a defense objection on relevance grounds. The District's counsel urged a "foundational requirement" that Churchill was acting on behalf of SLV CARE, asserting: "Without that, he doesn't have standing to testify here."

In sustaining the defense objection, the court explained that it considered Churchill's request "as being from an individual and not from the plaintiff in this action." The court acknowledged "that citizens have the right to invoke the protections of the statutes that we've been talking about"; but it concluded that "the evidence must be in some way related to the association [SLV CARE] or described as being from the association; and that's not the case in the instance of the e-mails." The trial court reiterated its reasoning in its statement of decision: "Mr. Churchill wrote his requests as an individual. He never identified himself as a member of SLV CARE. Any failure to produce documents pursuant to the Public Records Act may be actionable by

him as an individual. However, Mr. Churchill can't request records as an individual and then come into court as a representative of SLV CARE and complain of a failure to produce documents by the District in this action. The court's analysis had nothing to do with Mr. Churchill having to identify himself in order to obtain documents; it was merely a finding of lack of standing to pursue this action (in which he is not a party plaintiff) based on what he did individually."

Appellant assigns the trial court's decision as prejudicial error. According to appellant, its "members had no obligation to notify the District that they were representing themselves as individuals or were acting as members of SLV CARE." It further asserts: "Mr. Churchill had an absolute right to request and obtain public records." In appellant's view, the court's decision "makes sense only if Mr. Churchill had a duty to identify himself . . . as an individual or as a member of SLV CARE," which he did not.

We review the trial court's ruling for an abuse of discretion. "Broadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence. . . . Speaking more particularly, it examines for abuse of discretion a decision on admissibility that turns on the relevance of the evidence in question." (*People v. Waidla* (2000) 22 Cal.4th 690, 717–718 [94 Cal.Rptr.2d 396, 996 P.2d 46], citations omitted.) Put another way: "The trial court retains broad discretion in determining the relevance of evidence." (*People v. Garceau* (1993) 6 Cal.4th 140, 177 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Relevance is statutorily defined as "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Though not directly germane, a "matter collateral to an issue in the action may nevertheless be relevant to the credibility of a witness who presents evidence on an issue . . . ." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9 [82 Cal.Rptr.2d 413, 971 P.2d 618].) But the admissibility of such collateral matter also lies within the trial court's discretion. (*Id.* at p. 10.)

We first consider the factual component of the trial court's ruling. (Cf. *Johns v. City of Los Angeles* (1978) 78 Cal.App.3d 983, 998 [144 Cal.Rptr. 629] [consideration of the evidence "is essential to a proper exercise of judicial discretion"].) As to that component, "evaluating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling." (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 [24 Cal.Rptr.2d 654].) Here, the pertinent finding is that Churchill did not purport to act in his capacity as a member of SLV CARE when he requested the documents. Substantial evidence in the record supports that finding, in that Churchill's e-mails did not indicate that he was acting on appellant's behalf.

We next consider the legal basis for the trial court's evidentiary ruling. (Cf., *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704] [court must exercise its discretion within the "confines of the applicable principles of law"]; *In re Robert L., supra,* 21 Cal.App.4th at p. 1067 ["scope of discretion lies in the particular law to be applied"].) Here, the trial court concluded that any failure on the part of the District to provide documents to Churchill is actionable by him, but not by SLV CARE. We agree.

In affirming the trial court's decision, we acknowledge that "any person" may enforce the CPRA. (See *Connell v. Superior Court* (1997) 56 Cal.App.4th 601, 611 [65 Cal.Rptr.2d 738].) "Thus, when section 6253 declares *every* person has a right to inspect any public record, when section 6257 commands state and local agencies to make records promptly available to *any* person on request, and when section 6258 expressly states *any* person may institute proceedings to enforce the right of inspection, they mean what they say." (*Id.* at pp. 611–612.)

By the same token, however, the relevant statutory provision authorizes a plaintiff "to enforce *his or her right* to inspect or to receive a copy of any public record or class of public records under this chapter." (Gov. Code, § 6258, italics added.) That provision "contemplates a declaratory relief proceeding commenced only by an individual or entity seeking disclosure of public records . . . ." (*Filarsky v. Superior Court, supra,* 28 Cal.4th at p. 426, discussing Gov. Code, § 6258.) The statute provides neither explicit nor implicit authority for one person to enforce another's inspection rights. (Cf. Gov. Code, § 6264 [order allowing inspection or copying of public records by district attorney].) Churchill thus could enforce his own statutory rights, but not those of appellant SLV CARE.

In light of this legal authority, we conclude, the court properly determined that the proffered testimony was irrelevant to *appellant's* claim of disclosure violations. Nor did it have relevance as impeachment evidence relating to the superintendent's credibility, since Churchill's written requests for public records were not addressed to her. (Cf., *People v. Rodriguez, supra,* 20 Cal.4th at p. 10.)

In sum, the trial court had both an adequate factual basis and appropriate legal justification for its decision to exclude Churchill's testimony on this point. We therefore find no abuse of discretion in the challenged evidentiary ruling.

### C. Summary of Conclusions

Based on the evidence in the record, we affirm the trial court's determination that SLV CARE did not sustain its claim of CPRA and Brown Act violations. We also affirm the court's decision to exclude Churchill's testimony on this point.

## IV. COMMUNITY INVOLVEMENT STATUTES

SLV CARE argues that the District violated provisions of the Education Code that mandate community involvement in decisions involving school closures and the use of surplus property. As before, we begin by summarizing the applicable law.

### A. Governing Statutes

The applicable provisions are contained in the Education Code, part 10.5 (School Facilities), chapter 4 (Property: Sale, Lease, Exchange), article 1.5 (Advisory Committees).[15] That article comprises Education Code sections 17387 through 17391.

Education Code section 17387 provides in pertinent part: "It is the intent of the Legislature to have the community involved before decisions are made about school closure or the use of surplus space, thus avoiding community conflict and assuring building use that is compatible with the community's needs and desires." Education Code section 17388 sets forth the instances in which advisory committees may or must be used. It states: "The governing board of any school district may, and the governing board of each school district, prior to the sale, lease, or rental of any excess real property, except rentals not exceeding 30 days, shall, appoint a district advisory committee to advise the governing board in the development of districtwide policies and procedures governing the use or disposition of school buildings or space in school buildings which is not needed for school purposes." Requirements for the makeup of advisory committees are set forth in Education Code section

---

[15] In this section of the opinion (pt. IV), further unspecified statutory references are to the Education Code.

17389.[16] The duties of such committees are described in Education Code section 17390.[17] Finally, Education Code section 17391 authorizes the decision not to appoint a committee in certain limited circumstances, which are not pertinent here.

## B. Application

SLV CARE asserts the violation of these provisions, based on the District's appointment of two committees: the SSCC, which was convened prior to the April 2003 school closure decision; and the SPAC, which the District's Board appointed in October 2003.

### 1. *Superintendent's School Closure Committee*

SLV CARE contends that the SSCC "did not comply with [§] 17387 et seq. The Committee was directed to evaluate four schools, but was given incorrect and incomplete information."

We reject that contention on both procedural and substantive grounds.

First, as to procedure, appellant failed to support its argument in its opening brief. Evidentiary support for appellant's contention is offered for the

---

[16] Education Code section 17389 reads as follows: "A school district advisory committee appointed pursuant to Section 17388 shall consist of not less than seven nor more than 11 members, and shall be representative of each of the following:

"(a) The ethnic, age group, and socioeconomic composition of the district.

"(b) The business community, such as store owners, managers, or supervisors.

"(c) Landowners or renters, with preference to be given to representatives of neighborhood associations.

"(d) Teachers.

"(e) Administrators.

"(f) Parents of students.

"(g) Persons with expertise in environmental impact, legal contracts, building codes, and land use planning, including, but not limited to, knowledge of the zoning and other land use restrictions of the cities or cities and counties in which surplus space and real property is located."

[17] Education Code section 17390 provides: "The school district advisory committee shall do all of the following:

"(a) Review the projected school enrollment and other data as provided by the district to determine the amount of surplus space and real property.

"(b) Establish a priority list of use of surplus space and real property that will be acceptable to the community.

"(c) Cause to have circulated throughout the attendance area a priority list of surplus space and real property and provide for hearings of community input to the committee on acceptable uses of space and real property, including the sale or lease of surplus real property for child care development purposes pursuant to Section 17458.

"(d) Make a final determination of limits of tolerance of use of space and real property.

"(e) Forward to the district governing board a report recommending uses of surplus space and real property."

first time in its reply brief. As a matter of appellate procedure, we generally do not consider points first raised in an appellant's reply brief. (See, e.g., *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 894, fn. 10 [93 Cal.Rptr.2d 364].)

Second, on the merits, the contention is not persuasive. For one thing, the statute does not dictate what types or sources of information must be provided to an advisory committee. For that reason alone, SLV CARE has not shown a statutory violation. For another thing, it appears that the District made a good faith attempt to provide the committee with information that was complete and accurate. Although the SSCC might not have received every report in existence addressing the physical condition of the four schools, the committee's own reports demonstrate that it had evidence on some of the cited problems, such as the presence of mold in some classrooms and the current condition of the septic systems. Furthermore, with respect to particular reports that the committee did not have, SLV CARE fails to demonstrate prejudice from their absence. To the contrary, we find nothing in the cited reports to suggest that they would have affected the committee's recommendations. For example, the 1990 geotechnical report dismissed the Ben Lomond fault as "a potential earthquake source."

In short, we find no statutory violation by the District in connection with its SSCC.

### 2. *Surplus Property Advisory Committee*

SLV CARE attacks the District's use of the SPAC on two grounds. First, it asserts, the District should not have made the decision to declare the property surplus; rather, that decision should have been left up to the committee. (See Ed. Code, § 17390.) Second, it contends, the District violated the statute by failing to include representatives from all of the listed groups. (See Ed. Code, § 17389.) On that point, SLV CARE observes, the District made a purposeful decision not to solicit socioeconomic information from the applicants.

In its statement of decision, the trial court refused to rule on the issues, concluding that the claim was not yet ripe. As the court explained: "Education Code [sections] 17387–[173]90 relate to the creation of an Advisory Committee prior to and relating to the 'sale, lease or rental of excess real property . . . .' Those circumstances have not yet arisen."

 We agree with the trial court that appellant has no current cognizable claim under the statute. In pertinent part, Education Code section 17388 provides that a school district's governing board *"may,* and . . . prior to the sale, lease, or rental of any excess real property . . . *shall,* appoint a district

advisory committee . . . ." (§ 17388, italics added.) Given the circumstances here—with no surplus property then proposed to be sold, leased, or rented within the meaning of the statute—the District's use of the committee was discretionary, not mandatory. (See Ed. Code, § 75 ["may" is permissive; "shall" is mandatory].) Because the SPAC was not a statutorily mandated committee, the District was not bound by the statutory requirements for its composition or duties.

### C. Summary of Conclusions

As to appellant's claims concerning the SSCC, even if they are not forfeited, they lack merit. The governing statute does not dictate what information must be provided to an advisory committee, and the record does not support the contention that the information provided was inaccurate or incomplete. Concerning appellant's complaints about the SPAC, they are not cognizable under the statute. Under the circumstances presented here, the District's use of that committee was discretionary, not mandatory.

### V. EVIDENTIARY RULINGS

Appellant SLV CARE next takes issue with the trial court's evidentiary rulings. It contends that the court erroneously sustained objections, by relying on grounds other than those stated in counsel's objection, and by relying on grounds that are not recognized under the Evidence Code, such as over-breadth. Taken as a whole, appellant asserts, those rulings demonstrate bias. SLV CARE also contends that the court committed error by allowing the District's bond counsel to testify to legal conclusions.

As explained above, "an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla, supra,* 22 Cal.4th at p. 717; see also, e.g., *Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1523 [3 Cal.Rptr.2d 833] [expert testimony].) "A trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . . ." (*People v. Rodriguez, supra,* 20 Cal.4th at pp. 9–10, citations omitted; see Evid. Code, §§ 353, 354.)

Applying those principles in this case, we find no basis for reversal.

We first address appellant's claim that the court sustained numerous objections on erroneous grounds. Simply put, the record does not support that claim. In nearly all of the cited instances, either the objection or the ruling

had a cognizable basis, such as hearsay or lack of foundation. In cases where a question was challenged as overbroad, the court often asked counsel to narrow or rephrase it. Nor did the court's sua sponte rulings exceed the scope of its discretion. "It is well established that where questions are asked which are improper, the court acts within the scope of its duty in refusing to allow them to be answered, even though no objection be made." (*People v. White* (1954) 43 Cal.2d 740, 747 [278 P.2d 9]; see also, e.g., *Kimic v. San Jose-Los Gatos Etc. Ry. Co.* (1909) 156 Cal. 379, 390 [104 P. 986], criticized on another point in *Lane v. Pacific Greyhound Lines* (1945) 26 Cal.2d 575, 583 [160 P.2d 21].)

We next consider the assertion that the court demonstrated bias against SLV CARE. The record also belies that assertion. Far from exhibiting bias, the court showed admirable patience and even-handedness. The record is replete with instances where the court accommodated appellant's trial counsel, giving them considerable latitude, accommodating them, and occasionally even suggesting alternate approaches for presenting evidence.

Finally, we turn to appellant's argument that the court erred in permitting the District's bond counsel, William Kadi, to testify about the propriety of bond expenditures. We reject that contention. In this case, "there is no basis for concluding that the trial court relied on [the witness's] alleged legal conclusions . . . ." (*Hankins v. El Torito Restaurants, Inc.* (1998) 63 Cal.App.4th 510, 530 [74 Cal.Rptr.2d 684].) Instead, it appears that "the relevant portion of [his] testimony [was] his percipient testimony." (*Ibid.*) In ruling on the objection by appellant's trial counsel to the proffered testimony, the trial court acknowledged appellant's "right to object to Mr. Kadi expressing an opinion as to what I should find to be the law." But the court also noted Kadi's ability to address "factual issues in the case" and it therefore permitted his testimony. In its statement of decision, the court described Kadi's "opinions" as "somewhat self-serving" but characterized his "testimony" as "instructive to the court nonetheless." Given its comments, the trial court plainly understood its role as arbiter of the law. And because this was a bench trial, there was no danger of jury confusion. In short, we find no error in the court's decision to allow bond counsel to testify. Because we find no error, we need not consider prejudice. (*People v. Rodriguez, supra,* 20 Cal.4th at p. 10.)

To sum up, this record discloses no abuse of discretion by the trial court in connection with the challenged evidentiary rulings.

## VI. ATTORNEY FEES

Appellant SLV CARE claims entitlement to an award of attorney fees, citing three different statutory provisions. As we now explain, none of those provisions supports appellant's claim for fees.

Appellant first relies on Code of Civil Procedure section 1021.5. That provision, sometimes called the "private attorney general" statute, authorizes an award of attorney fees to the "successful party" in certain actions resulting in the "enforcement of an important right affecting the public interest." (Code Civ. Proc., § 1021.5; see *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565 [21 Cal.Rptr.3d 331, 101 P.3d 140].) Here, however, appellant is not the successful party in this litigation. For that reason, there is no basis for a fee award in its favor under this statute.

SLV CARE next claims entitlement to statutory fees under a provision of the CPRA: Government Code section 6259, subdivision (d). That provision mandates an award of fees and costs to prevailing plaintiffs in CPRA actions, and it also insulates unsuccessful plaintiffs from liability for the agency's defense costs, unless the action is "clearly frivolous." (Gov. Code, § 6259, subd. (d); see *Filarsky v. Superior Court, supra,* 28 Cal.4th at pp. 427–428.) "A plaintiff prevails within the meaning of the statute 'when he or she files an action which results in defendant releasing a copy of a previously withheld document.' " (*Los Angeles Times v. Alameda Corridor Transportation Authority* (2001) 88 Cal.App.4th 1381, 1391 [107 Cal.Rptr.2d 29].) In other words, "if a public record is disclosed only because a plaintiff filed a suit to obtain it, the plaintiff has prevailed." (*Ibid.*) Conversely, for purposes of the CPRA fee statute, a plaintiff has *not* prevailed where "substantial evidence supported a finding that the 'litigation did *not* cause the [agency] to disclose any of the documents ultimately made available . . . .' " (*Los Angeles Times v. Alameda Corridor Transportation Authority*, at 1391.) This case falls into the latter category. Although SLV CARE contends that its action against the District resulted in the release of previously withheld public records, it offers no citation to the evidentiary record to support that contention. We therefore affirm the trial court's implied determination that SLV CARE did not prevail on its CPRA claims. We also affirm the trial court's award of costs to the District, as SLV CARE offers no argument that the cost award was improper under the statute. (Gov. Code, § 6259, subd. (d).)

In its third and final fee claim, SLV CARE seeks statutory attorney fees pursuant to Government Code section 800. The factual predicate for an award of fees under that provision is "arbitrary or capricious action or conduct by a public entity." (Gov. Code, § 800.) In light of our affirmance of

the judgment in the District's favor, there is no basis for concluding that the District's actions were arbitrary or capricious, and thus no basis for an award of statutory fees under Government Code section 800.

In sum, there is no basis for any of appellant's claims to attorney fees.

## DISPOSITION

The judgment is affirmed. The District shall recover its costs on appeal.

Elia, Acting P. J., and Mihara, J., concurred.