TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

ROB BONTA
Attorney General

_____

| | : | |
|---|---|---|
| OPINION | : | No. 14-202 |
| | : | |
| of | : | May 19, 2022 |
| | : | |
| ROB BONTA | : | |
| Attorney General | : | |
| | : | |
| SUSAN DUNCAN LEE | : | |
| Deputy Attorney General | : | |

THE HONORABLE DAWYN R. HARRISON, ACTING LOS ANGELES COUNTY COUNSEL, has requested an opinion on questions related to school bonds.

**QUESTIONS PRESENTED AND CONCLUSIONS**

1. Must "premium" from the sale of school general obligation bonds be deposited in a school or community college district's interest and sinking fund, also known as a debt service fund?

Yes, all premium from the sale of school general obligation bonds must be deposited in the district's interest and sinking fund.

2. May premium be used to pay bond-related expenses such as bond issuance costs listed in Education Code section 15145(a), an underwriter's discount, or interest on previously issued securities?

No, bond premium may not be diverted to another purpose, such as to pay bond issuance costs, an underwriter's discount, or interest on previously issued securities.

1

## BACKGROUND

This opinion request asks us to address questions relating to the issuance of bonds by school districts and community college districts. The most common means of financing new school construction in California is for a school district to issue general obligation bonds.[1] Sale of the bonds supplies the school district with immediate funds to apply to construction projects, and then the district repays the bonds over time, with interest, by levying an *ad valorem* tax based on the appraised value of real property in the district.[2]

The specific questions presented here involve bond "premium," which is the amount a purchaser pays for a bond in excess of the face (or "par") value of the bond.[3] Typically, the initial purchaser of school district bonds is an underwriter—usually an investment bank dealing in municipal securities[4]—that resells the bonds to investors.

Sometimes bonds sell at a premium—that is, a price above par value—because the interest rate exceeds the interest rate that would attract willing purchasers of an otherwise identical bond offered at a price of par. In other words, bonds that offer a higher interest rate are more valuable than equivalent bonds that offer a lower interest rate. To receive this higher interest rate, the purchaser pays a premium when making the investment.[5]

---

[1] 92 Ops.Cal.Atty.Gen. 1, 2 (2009), citing *San Lorenzo Valley Community Advocates for Responsible Educ. v. San Lorenzo Valley Unified Sch. Dist.* (2006); 139 Cal.App.4th 1356, 1395; 99 Ops.Cal.Atty.Gen. 18, 19 (2016).

[2] 92 Ops.Cal.Atty.Gen., *supra,* at p. 2. An *ad valorem* tax is calculated as a percentage of the value of the taxable property. See Black's Law Dictionary (11th ed. 2019).

[3] As defined in the online glossary of the Municipal Securities Rulemaking Board, "premium" is "the amount by which the price paid for a security exceeds the security's par value." See Municipal Securities Rulemaking Board, Glossary of Municipal Securities Terms (3d ed. 2013, as updated Jan. 5, 2022) ("MSRB Glossary"), https://www.msrb.org/Glossary (search for "premium"). See also *id.* (search for "original issuance premium") (original issuance premium is "The amount by which the public offering price of a security at the time of its original issuance exceeded its par value. . . . The amount of original issue premium received by the issuer in a primary offering, also known as the 'bond premium,' is generally treated as proceeds of the issue").

[4] See 99 Ops.Cal.Atty.Gen., *supra*, at pp. 20-21 (describing municipal finance firms typically involved in school district bond sales).

[5] See *Hanover Bank v. C.I.R.* (1962) 369 U.S. 672, 677.

The opinion request asks about this premium and, more specifically, how school districts may lawfully use these extra proceeds of a bond sale.

Two statutes—Education Code section 15146, and Government Code section 29303—largely control the proceeds of school bond sales. Both statutes direct that a school district must deposit any premium it receives from bond sales into a fund dedicated to debt service, generally known as an "interest and sinking fund."[6] That fund also receives the property-tax revenues that are assessed to pay off the bonds.[7] The more premium is deposited into the interest and sinking fund, the less tax revenue is required to service the bond debt. When properly deposited in the fund as required by section 15146 and section 29303, bond premium thus redounds to the benefit of local taxpayers. When premium is diverted to other uses, however, those uses benefit at the expense of paying down the bond debt.

When school districts pay the costs of bond issuance, they ordinarily charge these costs to the school district's general fund or to its construction fund, reducing the amount of money available for operating expenses or for construction. That reduction can be substantial.[8] To avoid those outcomes, some districts have chosen to sell their bonds at a higher (premium) price by inflating the interest rate, and then to contract with the underwriter to charge the costs of issuance against the increased purchase price. In this way, some of the bond value that would otherwise have been "premium received by the district" is instead diverted to the underwriter and converted to pay costs of issuance. We are asked whether this diversion of premium is lawful.

Before turning to our analysis, we note that to provide the certainty necessary for agencies to manage their financial operations and attract bond buyers, Code of Civil Procedure sections 860 through 870.5 limit the period for filing any action to challenge a

---

[6] Ed. Code, § 15146, subd. (g) (premium to be deposited in "interest and sinking fund"); Gov. Code, § 29303 (premium to be deposited in "debt service fund"). A debt service fund, like an interest and sinking fund, is a fund into which money is deposited for the purpose of redeeming municipal bonds. (See MSRB Glossary, *supra*, https://www.msrb.org/Glossary [search for "bond fund," "debt service fund," "sinking fund"].)

[7] Ed. Code, §§ 15251, 15146.

[8] See generally Ed. Code, § 15145, subd. (a) (identifying items that may be categorized as costs of issuance).

3

14-202

school bond to just 60 days.[9]  Accordingly, nothing in this opinion implicates a school bond transaction for which the 60-day period has already run.

## ANALYSIS

The request first asks whether premium received from the sale of school general obligation bonds must be deposited in a school or community college district's "interest and sinking fund."[10]  To answer this question, we look to Education Code section 15146 and Government Code section 29303, which govern the proceeds of school bond sales.

Education Code section 15146(g) states:

The proceeds of the sale of the bonds, exclusive of any premium received, shall be deposited in the county treasury to the credit of the building fund of the school district, or community college district as designated by the California Community Colleges Budget and Accounting Manual.  The proceeds deposited shall be drawn out as other school moneys are drawn out.  The bond proceeds withdrawn shall not be applied to any purposes other than those for which the bonds were issued.  At no time shall the proceeds be withdrawn by the school district or community college district for investment outside the county treasury.  *Any premium or accrued interest received from the sale of the bonds shall be deposited in the interest and sinking fund of the school district or community college district.*[11]

Government Code section 29303 states:

Whenever any bonds issued by any county or by any school, drainage, or other district in any county, whose accounts are required by law to be kept by the county auditor and treasurer, are sold at a premium or with accrued interest, or both, *the amounts received for the premiums and accrued interest shall be deposited in the*

---

[9] See *McGee v. Torrance Unified School Dist.* (2020) 49 Cal.App.5th 814 (complaint implicating invalidity of bond subject to 60-day limitation regardless of form of action); Code Civ. Proc., §§ 860-870.5 (validation actions); Gov. Code, § 53511 (bonds subject to validation process).

[10] There is no material difference for purposes of this Opinion between school districts and community college districts.

[11] Ed. Code, § 15146, subd. (g) (italics added).

4

*debt service fund of the county or district unless it is expressly provided by law that they be deposited in some other fund.*[12]

The plain text of these provisions requires that school bond premium be deposited in the "interest and sinking fund" or the "debt service fund," not used for issuance costs or other uses.

This legislative policy choice has deep roots. Education Code section 15146 originated as School Code section 4.975 in 1931, which stated that "[a]ny premium or accrued interest received from the sale of the bonds shall be deposited in the interest and sinking fund of the district."[13] And Government Code section 29303 traces back nearly word for word to the enactment of Political Code section 4087a in 1919.[14]

It is noteworthy that Political Code section 4087a's mandate to deposit premium into the interest and sinking fund superseded a 1913 statute providing that premium would be deposited in the *building fund*.[15] The enactment of Political Code section 4087a in 1919 reflects a deliberate policy change by the Legislature to make bond premium of schools and other districts unavailable for any use other than debt service, absent express statutory authorization for another use.

We note that other statutes make bond premium available for other uses in addition to relief of debt service.[16] These other statutes are consistent with Government Code section 29303, which requires premium to be deposited in a debt service fund "unless it is expressly provided by law that they be deposited in some other fund." These

---

[12] Gov. Code, § 29303.

[13] Stats. 1931, ch. 297, § 2, p. 720.

[14] "Whenever any bonds . . . are sold at a premium or with accrued interest, or both premium and accrued interest, the amounts received for such premiums and accrued interest shall be deposited in the interest and sinking fund of such county or district unless it is subsequently expressly provided by law that they shall be deposited in some other fund . . . ." Pol. Code, § 4087a (1919); see Stats. 1919, ch. 257, § 2, p. 406.

[15] Pol. Code, § 1886; Stats. 1913, ch. 151, § 1, p. 233.

[16] See Ed. Code, § 15150, subd. (d) (district may issue notes in anticipation of sale of voter-approved bond issue; interest on notes may be repaid "from proceeds of the sale of the bonds in anticipation of which the notes are issued, including any premium on the sale of those bonds."); see also Gov. Code, §§ 6588, subd. (*x*)(4), 16757, subd. (b); Mil. & Vet. Code, § 998.552; Sts. & Hy. Code, §§ 149.12, 2704.18.

5

other statutes also demonstrate that, when the Legislature intends to allow premium to be used for other purposes, it specifies the permissible uses in statutes. The Legislature has not specified other purposes here, however. To the contrary, Education Code section 15146(g) expressly provides that premium shall be deposited in the interest and sinking fund, and does not authorize any other use.

Some districts posit that if premium is diverted to the underwriter to pay costs of issuance then it is never actually "received" by the district within the meaning of Education Code section 15146 or Government Code section 29303. We do not agree. This appears to us to be an attempt to conform to the letter of the law while evading its purpose. The manifest purpose of Education Code section 15146 and Government Code section 29303 is that a bond's premium value should accrue to the benefit of taxpayers.[17] School districts may choose to set interest rates that generate premium value, but the additional value must be used to benefit taxpayers, not the district.[18]

The second question submitted to us asks whether premium may be used to pay bond-related expenses such as bond issuance costs listed in Education Code section

---

[17] See 15 McQuillin Mun. Corp. § 43.133 (3d ed.).

[18] E.g., Ed. Code, § 15143 (permissible interest rates); see Gov. Code, §§ 43628, 26299.071, 26298.40; Health & Saf. Code, § 13935; Pub. Util. Code, §§ 60160, 98341, 99019, 100609, subd. (a), 102508, 103507, 105207, 131118, 142273; Rev. & Tax Code, § 8523; Wat. Code App., ch. 570, § 292; ch. 1060, § 14 (Deering).

15145(a), an underwriter's discount,[19] or interest on previously issued securities. For all of the reasons already given, we conclude that bond premium value may not be diverted to any other purpose.

We acknowledge a possible argument cutting the other way. In 1959, the Legislature first enacted a statute allowing school districts to pay costs of issuance "from the proceeds of sale of the bonds."[20] If taken out of context, this language might be used to support an argument that costs of issuance are payable from premium because the term "proceeds" includes premium. We agree that bond premium is generally a component of bond proceeds.[21] According to a longstanding rule of statutory construction, however, the more specific mandate of section 15146(g) should take precedence over the more general authorization of section 15145(a).[22]

---

[19] As defined in the MSRB Glossary, the "underwriter's discount" (i.e., underwriter's fee) is the "difference between the price paid by the underwriter to the issuer for the new issue and the prices at which the securities are initially offered to the investing public." (MSRB Glossary, *supra*, https://www.msrb.org/Glossary.) This is also called the "gross spread," "gross underwriting spread," or "production." (*Id.* [search for "underwriter's discount"].) The underwriter's discount is a bond-related expense paid indirectly by the bond issuer to the underwriter for services relating to selling the bonds to investors and managing elements of the transaction. These costs are deducted from the proceeds of the bonds by the underwriters at closing and therefore issuers typically do not write a check for these services. (See Government Finance Officers Association, *Best Practices, Debt Issuance Transaction Costs* (Feb. 28, 2013) at https://www.gfoa.org/materials/debt-issuance-transaction-costs.) The underwriting spread compensates the underwriter for certain services rendered and is the source of underwriting profits. (Issue Briefs, Understanding the Underwriting Spread, California Debt and Investment Advisory Commission (March 1993); see also California Debt and Investment Advisory Commission, California Debt Financing Guide, section 5.42 (March 2022), https://www.treasurer.ca.gov/cdiac/debtpubs/financing-guide.pdf 8523.)

[20] See Ed. Code, § 15145, subd. (a); formerly Ed. Code, § 21809 (Stats. 1959, ch. 418, § 1, p. 2358).

[21] See 92 Ops.Cal.Atty.Gen., *supra*, at p. 13 & fn. 62, citing *City of Oakland v. Williams* (1987) 107 Cal.App. 340, 341.

[22] See *City of Oakland v. Williams, supra,* 107 Cal.App. at p. 342; see also *State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th 940, 960 (more specific provision controls over more general); *People v. Vanvleck* (2016) 2 Cal.App.5th 355, 365 (same); *Department of Veterans Affairs v. Duerksen* (1982) 138 Cal.App.3d 149, 157 (same).

In sum, we conclude that all of the premium from the sale of a general obligation school bond must be deposited in the district's interest and sinking fund, and any agreement between a district and bond purchaser to circumvent that requirement by diverting bond premium value to some other purpose—such as to pay bond issuance costs, underwriters' discounts, or interest on previously issued securities—is contrary to the meaning and purpose of Education Code section 15146(g).